No. 14305

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

STATE OF MONTANA,

               Plaintiff and Respondent,

   -vs-

GUY JOHN ALLIES,

               Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
             Honorable Nat Allen, Judge presiding.

Counsel of Record:

   For Appellant:

      Richter and Lerner, Billings, Montana
      Frank Richter argued and Alan J. Lerner argued, Billings,
      Montana

   For Respondent:

      Hon. Mike Greely, Attorney General, Helena, Montana
      Mike McCarter argued, Assistant Attorney General, and
      Chris Tweeten argued, Assistant Attorney General, Helena,
      Montana
      Harold F. Hanser argued, County Attorney, Billings, Montana

---

Submitted: April 30, 1979

Decided: DEC 31 1979

Filed: DEC 31 1979

_Thomas J. Kearney_
                     Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant, Guy John Allies, was charged with four counts of deliberate homicide and tried by a jury in the Thirteenth Judicial District Court for Yellowstone County. A verdict of guilty on four counts of the lesser included offenses of mitigated deliberate homicide was returned, and judgment of conviction was entered. Defendant appeals.

The crimes underlying the case came to the attention of the Billings police when, shortly before noon on November 11, 1976, the department received a call on its 911 emergency line. Over the phone, the police dispatcher heard screaming, a gunshot, and the sound of someone moving around. The call was traced and led police officers to a Billings residence where they found the bodies of Tom Tillotson; his wife, Terri; Mrs. Tillotson's six year old daughter, Sherri; and, the couple's two year old son, Montana. Each had been shot once in the head with a small caliber weapon. Mrs. Tillotson, who was found clutching the phone, had also been shot in the jaw.

Lt. Charles Hensley of the Billings police force immediately took charge of the investigation and continued to act in that capacity until the defendant was arrested. Assisting him, and figuring prominently in the case, were detectives Gordon Hirischi, George Bell and Jack Trimarco. Initially, the investigative team had little factual information. The adult victims were involved in area drug trafficking and large quantities of drugs, primarily marijuana and cocaine, were found at the scene of the crime. In addition, a light blue van had been parked in the neighborhood at the time the crimes were committed, and an uniden-

tified man had been seen walking down the alley in back of the Tillotson house.

There was uncontradicted testimony that Lt. Hensley said there would be no drug-related arrests from any information received in connection with the homicide investigation. County Attorney Harold Hanser stated that no blanket immunity was given, and several officers said the leniency was limited to drug dealings with the victims.

During the investigation it was learned that the Tillotsons dealt in drugs with someone named John who drove a blue van. Defendant's name was first mentioned to police on November 17. He was identified by Tom Tillotson's business partner as a person whose connection with the Tillotsons was drug related.

On November 22, defendant voluntarily went to the Billings police station because he heard Lt. Hensley wanted to talk to him about the homicides. He was accompanied by Kathy Terry, a woman with whom he lived. Officer Hirischi met with defendant Allies and testified that, on this date, he did not view defendant as a suspect in the investigation. The conversation concerned defendant's relationship with the Tillotsons. He was not given his Miranda rights but was told that he would not be arrested on drug charges which could be brought as a result of his cooperation in the homicide investigation. According to Officer Hirischi, the immunity covered only transactions with the Tillotsons.

On November 23, defendant voluntarily returned to the police station, again accompanied by Kathy Terry. They were interviewed by Officers Hirischi and Bell. Defendant was asked about his activities on November 10 and 11 and about a gun he owned. The officers noted that Allies had trouble

answering questions, could not keep names or dates straight and was possibly on drugs. Arrangements were made for Allies to take a polygraph examination.

The polygraph test took place on November 30 and was conducted by police Lt. Jere Wamsley. The results were not admitted in evidence, but Wamsley's report was available to the investigators. The test lasted approximately three hours, and defendant's participation was voluntary. Defendant said he had been drinking prior to the test and was on some type of medication. Nevertheless, his reactions during the first part of the examination were normal. When confronted with a diagram of the Tillotson house, defendant became "squirrely," and by the end of the interview he was "talking to the walls" and "completely out of it."

Between 10:00 and 10:30 a.m. on December 9, Officers Bell and Trimarco confronted defendant near his house and asked him to accompany them to the police station. Defendant said he had not eaten breakfast but would be down once he had. He voluntarily presented himself at the station around 11:00 a.m. and was taken to a 12' x 12' room on the fourth floor. Here he was isolated and questioned for approximately four hours by Officers Bell and Trimarco. He had not had anything to eat but was under the influence of a large quantity of drugs--namely, methamphetamine, triavil and morphine. Before the session began, Bell read defendant his Miranda rights off a card and defendant signed a waiver printed on the back of the card. Officer Trimarco testified that defendant understood his rights and did not, at this or any other time during the session, ask for an attorney.

The officers attempted to employ a "Mutt and Jeff," or a "mean cop--nice cop" method of interrogation during the

first part of the session. One of the officers testified that he got a "little emotional" during the interview. Allies described the officers as generally rough, harsh and obnoxious. Both officers eventually told defendant that if he needed psychiatric help, it was available. He was also told something was wrong with the November 30 polygraph test and that the officers knew he was the murderer. He was accused of the crimes on several occasions, and the questioning concentrated on how he could live with himself after committing such brutal acts. In employing this "guilt assumption" method of interrogation, both officers freely concede they lied to defendant about what they knew of his connection to the homicides. They told him he had been positively identified and placed at the scene of the crime.

At first defendant's story was consistent with what he had earlier told Detective Hirischi. He said he was working on his van at a rented garage when the murders occurred and had returned home about 1:00 or 2:00 p.m. on November 11. After about twenty minutes, Trimarco advised defendant that they did not believe his story, that he was a suspect in the homicides, that they knew he was the killer, and that he had positively been placed at the scene of the crime.

Defendant then changed his story. He stated that he had "blacked out" as he was changing oil and "came to" at a grocery store near the Tillotson house. He said he could not remember where he was at the time the crimes were committed. During the questioning, defendant was shown a portrait of the Tillotson children as well as a picture of Mrs. Tillotson as she was found on November 11. Defendant became upset and very depressed at the idea he could have committed such an act. He began to sob and threatened to

commit suicide. He told the officers of his heavy drug use; that he belived the "Space Brothers" had landed in Wyoming and were exerting an evil influence over him; that he believed in witchcraft; and, that his ex-wife was a witch who had placed an evil curse on him.

Defendant says he was suffering from drug withdrawal and at about 3:00 p.m. asked for food to relieve his discomfort. The officers do not recall such a request. Allies said he thought he needed psychiatric help, and the officers expressed the opinion that his problem was medical or mental rather than criminal. Hospitalization at Warm Springs was mentioned.

During the interrogation, the officers told defendant they were not "too concerned with" drugs; rather, they were seeking information or evidence pertinent to the Tillotson homicides. They said they would like to search his house and van for homicide evidence, and defendant executed the following consent to search:

"I, Guy John Allies,
GIVE Det. Bell and Trimarco WHO HAVE IDENTIFIED THEMSELVES AS POLICE OFFICER(S) FOR THE CITY OF BILLINGS, YELLOWSTONE COUNTY, DO HEREBY CONSENT TO HAVE THEM SEARCH MY HOME OR PROPERTY LOCATED AT 628 No. 14 1965 GMC Van Blue AND I HAVE ALSO BEEN ADVISED THAT I DO NOT HAVE TO GIVE THESE OFFICERS PERMISSION TO SEARCH MY HOME AND PROPERTY. I AM GIVING THIS CONSENT WITHOUT ANY THREATS OR PRESSURES OF ANY TYPE USED AGAINST ME.

"SIGNED: S/ Guy John Allies

"WITNESS: S/ G. Bell ADDRESS Billings Police Dept.

"WITNESS: S/ John Trimarco ADDRESS B.P.D."

Bell and Trimarco left defendant's presence about 3:45 p.m. and were engaged in searching the house and van from about 4:00 to 7:30 p.m. Meanwhile, defendant was left in the fourth floor room. Because of his suicide threats, he

was "watched" by Officers Ward and Millard. Allies testified that during this time he asked Ward when he would be allowed to see an attorney and that he was told to wait until Bell and Trimarco returned. Ward denies that this occurred.

During the afternoon, both Lt. Hensley and Harold Hanser, the Yellowstone County Attorney, had been posted on the progress of the interrogation. At approximately 4:15 p.m., Hanser contacted Dr. Bryce Hughett, a psychiatrist employed by the State. Hanser informed him there was a suspect in the Tillotson homicides who could not remember where he had been when the crimes were committed. He also said the suspect had indicated a desire to see a psychiatrist and asked Hughett to come down.

On arriving at the station, Hughett was further briefed on the situation by Hanser and Lt. Hensley. Hughett, who felt he was acting as a fact finder or assistant to the investigator and as a doctor, talked with defendant from approximately 5:00 to 6:00 p.m. Hensley was present for the first 20 or 30 minutes of the interview. Allies was not given his Miranda rights at this time; nor was he informed there was no doctor-patient privilege cloaking the conversation. Hughett stated that Allies was "calm--spoke quietly and willingly. He knew Lt. Hensley was an investigative officer and didn't object to him remaining." The major topics of discussion were defendant's past, particularly his drug abuse problem, and the Tillotson homicides. During the interview Hughett suggested that sodium amytal, a hypnotic drug, might allow Allies to remember where he had been during his November 11 blackout.

By the time the interview concluded, Bell and Trimarco had returned from searching defendant's house and van. They had found drugs at his house and a number of .22 caliber cartridges in the van. Bell, Trimarco and Hensley testified that on the evening of December 9, they did not have enough to hold defendant in connection with the homicides. Instead, he was charged with the possession of dangerous drugs and placed in the Yellowstone County jail. Hensley read Allies his <u>Miranda</u> rights upon arresting him and left instructions with the jailer to allow defendant to contact him at any time. Hensley stated the drug arrest was "part of" or a "tool" in the homicide investigation.

On Friday, December 10, Allies was taken to justice court for a preliminary hearing on the drug charge. He was informed of the charge against him, and his rights were slowly read to him by Justice of the Peace Pedro Hernandez. Defendant testified that he fully understood his rights at this time, and it is undisputed that he asked to see an attorney. He was informed that an attorney can be appointed only in District Court and was told that one would be appointed for him upon his appearance in that court. This is the last time the drug charge was mentioned. It was dropped after defendant was charged with the Tillotson homicides.

Later the same day, defendant was taken to Hanser's office for an interview. He was not given his rights and had not yet seen an attorney. Hanser discussed the "truth serum" (sodium amytal) interview with him and told defendant he could rest and relax at the hospital. Defendant agreed to try the serum.

On Saturday, December 11, defendant was taken from the jail and placed in the Intensive Psychiatric Care Room of

the psychiatric ward at Deaconess Hospital. Dr. Hughett talked with defendant at various times during the day. Allies testified that around 4:00 p.m. he asked Hughett when he would see an attorney and that Hughett told him to wait until Hanser arrived. Hughett denied that Allies made such an inquiry. Later that evening, after hearing strange noises from defendant's room, a guard entered and found defendant crouched on the bed, sobbing and saying, "The Devil wants me to hurt you." The guard controlled the situation by having Allies pray.

Very soon after the above incident, Dr. Hughett, Lt. Hensley and Harold Hanser arrived. The serum was injected, the lights were dimmed, and the interrogation began. Without being advised of his rights, defendant was asked questions by Hughett and Hensley and made several incriminating statements. He placed himself at the scene of the crime but said another person committed the murders. While under the drug, he was told his story was inconsistent.

The next day Allies was awakened around 10:00 a.m. He says he was sleepy and groggy. Expert testimony indicated that the residual effects of the "serum" would be like a mild hangover. Dr. Hughett spoke with defendant for 45 minutes about the serum experience and the Tillotson murders. Allies still denied being the murderer and claimed another man did it. Hughett told him the "serum" story was inconsistent and contradictory; that nobody would believe him; that to clear himself, he would have to help locate the other man and prove his existence; and that he himself could be the other man.

About 15 minutes after the above conversation, Lt. Hensley read defendant his rights and obtained a purported

waiver. Allies then confessed to committing the homicides. He also said he had buried the murder weapon and described its location. Later the same day, he directed the police to the weapon, a .22 caliber derringer. After the pistol was unearthed, a thumbprint found thereon was positively identified as defendant's. FBI ballistics tests confirmed that the pistol was the murder weapon.

Allies was charged with four counts of deliberate homicide on December 13 and was appointed an attorney with whom he consulted on the afternoon of that date. On December 23, defense counsel entered into a stipulation dismissing the drug charge. Defendant moved to suppress the confession and the evidence to which it led. After five days of testimony the trial court found and concluded that the confession was given voluntarily and therefore it, along with its fruits, was admissible.

The case proceeded to jury trial in Yellowstone County with the Honorable Nat Allen presiding. The jury returned verdicts of guilty on four counts of mitigated deliberate homicide. Defendant was sentenced to the maximum punishment possible: 40 years in the state prison on each count to run consecutively without possibility of parole.

From the denial of his various motions and the judgment of conviction, defendant appeals and raises the following issues:

1. SUPPRESSION. Whether the District Court properly denied defendant's motion to suppress the confession and its fruits.

2. PHOTOGRAPHIC EVIDENCE. Whether the District Court erred in admitting certain photographic evidence.

3.  SENTENCE PROCEDURE.  Whether defendant's sentence was properly imposed.

4.  SPEEDY TRIAL.  Whether defendant was denied his right to a speedy trial.

5.  MENTAL DISEASE/DEFECT.  Whether the statutory scheme relating to mental disease or defect is unconstitutional.

6.  VENUE.  Whether the District Court erred in not granting defendant's motion for a change of venue.

7.  BALLISTICS EXPERT.  Whether the District Court erred in refusing to appoint a ballistics expert for defendant.

8.  HUGHETT'S TESTIMONY.  Whether the District Court erred in allowing Dr. Hughett to testify regarding defendant's mental capacity.

9.  TRIAL JUDGE PREJUDICE.  Whether the trial judge conducted himself so as to convey prejudice to the jury.

10.  CUMULATIVE ERROR.  Whether there is cumulative error requiring reversal.


SUPPRESSION

In spite of the fact that they are out of court statements seemingly subject to exclusion as hearsay, confessions are generally admissible against criminal defendants. McCormick, Evidence, 2d. Ed., §145 at 311.  As recognized in Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, in-custody interrogations and confessions resulting therefrom are not, in and of themselves, barred; they "remain a proper element in law enforcement," 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726, and "may play an important role in some convictions."  384 U.S. at 481, 86 S.Ct. at 1631, 16 L.Ed.2d at 727.

However, the procurement of a confession must comport with the guarantee that an individual will not be compelled to incriminate himself (U.S. Const., Amend. V; 1972 Mont. Const., Art. II, §25), and that he may not be convicted of a crime without due process of law (U.S. Const., Amend. XIV; 1972 Mont. Const., Art. II, §17).

We noted above that confessions are generally admissible. However, "[t]he true test of admissibility is that the confession is made freely, voluntarily and without compulsion of any sort." Wilson v. United States (1896), 162 U.S. 613, 623, 16 S.Ct. 895, 899, 40 L.ed. 1090, 1096. See also Bram v. United States (1897), 168 U.S. 532, 18 S.Ct. 183, 42 L.ed. 568; State v. Lenon (1977), ____ Mont. _____, 570 P.2d 901, 34 St.Rep. 1153; State v. Lucero (1968), 151 Mont. 531, 445 P.2d 731. Historically, involuntary confessions were excluded because they were felt to be untrustworthy. 3 Wigmore on Evidence, Chadbourn Revision, §822. While this rationale may retain some vitality, it is no longer the sole reason for the exclusion of involuntary confessions. Spano v. New York (1959), 360 U.S. 315, 320, 79 S.Ct. 1202, 1205-06, 3 L.Ed.2d 1265, 1270. The use of an involuntary confession, whether it be true or false, vitiates a criminal conviction on the basis that it violates the guarantee against self-incrimination, Bram v. United States (1897), 168 U.S. 532, 542, 18 S.Ct. 183, 42 L.ed. 568, Malloy v. Hogan (1964), 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653, as well as the right to due process of law, Blackburn v. Alabama (1960), 361 U.S. 199, 205, 80 S.Ct. 274, 279, 4 L.Ed.2d 242, 247.

As stated by the United States Supreme Court: "The Fourteenth Amendment forbids fundamental unfairness in the

use of evidence, whether true or false."   Blackburn v.

Alabama, 361 U.S. at 206, 80 S.Ct. at 280, 4 L.Ed.2d at 248.

> ". . . In a line of decisions beginning in 1936
> with Brown v. Mississippi (1936), 297 U.S. 278,
> 56 S.Ct. 461, 80 L.Ed. 682, and including cases
> too numerous to bear citation, [the Court] has
> established the principle that the Fourteenth
> Amendment is grievously breached when an in-
> voluntary confession is obtained by a state
> officer and introduced into evidence in a crim-
> inal prosecution which culminates in a convic-
> tion."   Blackburn v. Alabama, 361 U.S. at 205,
> 80 S.Ct. at 279, 4 L.Ed.2d at 247.

The policy underlying the constitutional doctrine has

been lucidly stated as follows:

> "The abhorrence of society to the use of in-
> voluntary confessions does not turn alone on
> their inherent untrustworthiness.   It also
> turns on the deep-rooted feeling that the
> police must obey the law while enforcing the
> law; that in the end life and liberty can be
> as much endangered from illegal methods used
> to convict those thought to be criminals as
> from the actual criminals themselves."   Spano
> v. New York, 360 U.S. at 320-321, 79 S.Ct. at
> 1205-1206, 3 L.Ed.2d at 1270.

> ". . . convictions following the admission into
> evidence of confessions which are involuntary,
> i.e., the product of coercion, either physical
> or psychological, cannot stand.   This is so not
> because such confessions are unlikely to be
> true but because the methods used to extract
> them offend an underlying principle in the en-
> forcement of our criminal law: that ours is an
> accusatorial and not an inquisitorial system--
> a system in which the State must establish
> guilt by evidence independently and freely se-
> cured and may not by coercion prove its charges
> against an accused out of his own mouth."
> Rogers v. Richmond, 365 U.S. at 540-41, 81 S.Ct.
> at 739, 5 L.Ed.2d at 766.

In reviewing suppression proceedings, we are governed

by the following well settled principles:

> "When a motion to suppress is presented to a
> trial court, its analysis of the evidence pre-
> sented at the pretrial hearing must focus on
> whether impermissible procedures were followed
> by law enforcement authorities.   The burden of
> proof of voluntariness is upon the State, and
> it is required to prove voluntariness by a pre-
> ponderance of the evidence but not beyond a
> reasonable doubt.   [Citations omitted.]"   State

v. Smith (1974), 164 Mont. 334, 338, 523 P.2d
395, 397; see also Lego v. Twomey (1972), 404
U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618.

> "The question of voluntariness largely depends
> upon the facts of each case, no single fact
> being dispositive . . . The determination of
> voluntariness, rather, depends upon the 'totality
> of the circumstances.' [Citations omitted.]"
> State v. Lenon (1977), ____ Mont. ___, 570 P.2d
> 901, 906, 34 St.Rep. 1153, 1157; see also
> Greenwald v. Wisconsin (1968), 390 U.S. 519, 88
> S.Ct. 1152, 20 L.Ed.2d 77; Gallegos v. Colorado
> (1962), 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d
> 325, 87 ALR2d 614; State v. Lucero (1968), 151
> Mont. 531, 538, 445 P.2d 731, 735.

We emphasize that the issue of voluntariness is a factual
one addressed to the discretion of the trial court. State
v. White (1965), 146 Mont. 226, 234-35, 405 P.2d 761, cert.
denied 384 U.S. 1023, 86 S.Ct. 1955, 16 L.Ed. 1026. We do
not sit as triers of fact; nor do we lightly disturb the
trial court's decision.

> "Smith and Lenon make it clear that the standard
> to be applied by the trial judge on a suppres-
> sion of admissions question is 'preponderance of
> the evidence', but when the same question comes
> to us on appeal to the credibility of the wit-
> nesses and the weight to be given their testi-
> mony is for the trial court's determination
> and our reveiw is limited to determining whe-
> ther there is substantial credible evidence
> supporting the District Court's findings."
> State v. Grimestad (1979), ____ Mont. ____,
> 598 P.2d 198, 203, 36 St.Rep. 1245, 1251.

By the same token, we cannot ignore uncontradicted, unim-
peached, credible testimony contrary to the trial court's
finding.

With the foregoing concepts in mind, we consider the
facts of this case. The trial judge found and concluded as
follows:

> "The Court finds the statements made by Defendant
> including all confessions exculpatory and incul-
> patory, were made voluntarily by the Defendant,
> without any doubt by the Court."

This general statement is not supported by substantial credible evidence.

At the outset, we note that defendant was advised of his *Miranda* rights before he confessed. We recognize this to be only a factor in determining if, in the "totality of the circumstances," the confession was voluntary; it is not, in and of itself, dispositive of the question. Miranda v. Arizona, 384 U.S. at 469-70, 86 S.Ct. at 1625, 16 L.Ed.2d at 721. Proceeding from this proposition is a corollary that advising a suspect of his constitutional rights is not license to coerce a confession from him; neither does it legitimize any coercion which precedes a waiver of those rights. More than mere lip service must be given to *Miranda* and the principles it embodies. State v. Grimestad, supra.

The pressures used on defendant to induce the confession were psychological rather than physical. This type of coercion nonetheless renders a confession involuntary. Blackburn v. Alabama, 361 U.S. at 206, 80 S.Ct. at 279, 4 L.Ed.2d at 247; see also Townsend v. Sain (1963), 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770, 782.

Whether or not defendant was "in custody" during the December 9 interrogation by Officers Bell and Trimarco is not pertinent to a determination of whether his ultimate confession was voluntary and thus admissible. The circumstances of that session are, however, relevant as coercive factors which figure in determining if, in the totality of circumstances, the confession is voluntary. Many of the factors have been judicially condemned as coercive in nature. See generally, *Miranda*, 384 U.S. at 445-58, 86 S.Ct. at 1612-19, 16 L.Ed.2d at 707-14. These factors include keeping the suspect incommunicado in a small room; isolating

the suspect in a hostile police environment; the mean cop--nice cop interrogation technique; and, the guilt assumption technique of interrogation. The factors do not, of themselves, render the confession involuntary; they must merely be considered in the totality of circumstances. The effect of most of the above variables and interrogation techniques on the final calculus is diminished by the time lag between the initial questioning on December 9 and the confession. Also entering into our analysis is the fact that, for the most part, the above-described circumstances and methods were not repeated after December 9.

The sodium amytal interview was the controlling device used in obtaining the confession. As we will discuss below, this session occurred in direct contravention of defendant's right to counsel and is inadmissible at trial. It is an important factor in the "totality of circumstances" which must be considered. See generally, Townsend v. Sain, supra; State v. Hudson (Mo. 1926), 289 S.W. 920.

Two variables weigh heavily in our consideration. The first, lying to defendant about how much is known about his involvement in the crimes, is particularly repulsive to and totally incompatible with the concepts of due process embedded in the federal and state constitutions. The effect is particularly coercive and in this case is not lessened by the time lag between the initial interrogation and the confession. The lie, although not repeated, was reinforced by Dr. Hughett, the "investigator-psychiatrist" who conversed with defendant approximately fifteen minutes before he confessed. He told defendant that his story was inconsistent, that nobody would believe him, that he would have to produce the real killer to clear himself, and that he could in fact be the killer.

The second factor to which we give weight is the "subtle" psychological pressure which was exerted on Allies from the time he first talked with Bell and Trimarco until the time he confessed. The pressure of which we speak lies in leading defendant to believe his problem was "medical or psychiatric rather than criminal." It began on December 9 when Bell and Trimarco gave defendant their opinion about his situation and told him he could get help, possibly at Warm Springs. The pressure was kept up, and the idea that his problem was psychological was reinforced later on the 9th in the initial contact with Dr. Hughett.

The next morning the county attorney again mentioned sodium amytal and told defendant he could go to the hospital and rest. Again, emphasis was placed on the medical rather than the criminal aspects of his problems. He was taken to the hospital on the morning of the 11th and placed in the intensive care room of the psychiatric ward. He underwent a battery of medical tests and talked with Dr. Hughett for about an hour and a half about his medical history. On the night of the 11th, Hughett administered sodium amytal to defendant in the presence of Lt. Hensley and the county attorney. The next morning, Hughett again spoke with defendant, relating to him the specifics noted above. Scarcely fifteen minutes later, Allies confessed to Lt. Hensley, who, during the confession, kept up the psychological pressure by telling Allies he knew he needed help.

The pivotal issue presented here is whether the results of the sodium amytal (popularly known as truth serum) test are admissible where the recipient was without benefit or advice of counsel and had not received a Miranda warning immediately preceding the administration of the serum. We

find they are not. The overwhelming weight of authority in this country still regards truth serum tests as inadmissible inasmuch as they have not attained the scientific acceptance as reliable and accurate means of ascertaining truth or deception. See State v. Linn (1969), 93 Idaho 430, 462 P.2d 729, 732.

Again we note that defendant was read his rights before confessing and at other times during the period in issue. The act of advising a person of his rights is not a license to coerce a confession; nor does it vitiate any coercion or pressures which precede the confession. We find that, in considering the totality of the circumstances, the State did not, by a preponderance of the evidence, show that defendant voluntarily and knowingly waived his constitutional right against self-incrimination or that he voluntarily confessed. Even after giving deference to the trial court's determination, we are constrained by the facts of this case to hold that a finding contrary to ours is not supported by substantial credible evidence. The trial court erred in not granting the motion to suppress the confession.

To summarize, defendant's confession was inadmissible on the basis that it was not voluntary. In addition, the confession also grows out of a denial of defendant's right to counsel.

Defendant contends that under the "fruit of the poisonous tree" concept of Wong Sun v. United States (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, the evidence obtained as a result of his confession should be suppressed. We agree.

Evidence gained as a result of a constitutional violation cannot be used to uncover other physical evidence.

Orozco v. Texas (1969), 394 U.S. 324, 89 S.Ct. 1095, 22

L.Ed.2d 311, discussed in Nedrud and Oberto, The Supreme

Court and the Criminal Law, Vol. 1B, §1.3-13; Wong Sun v.

United States, supra; Gladden v. Holland (9th Cir. 1966),

366 F.2d 580; Wakeman v. State (Fla.App. 1970), 237 So.2d

61; Dover v. State (Miss. 1969), 227 So.2d 296; State v.

Lekas (1968), 201 Kan. 579, 442 P.2d 11; People v. O'Leary

(1967), 45 Ill.2d 1̶1̶2̶ /122, 257 N.E.2d 112; People v. Ditson

(1962), 20 Cal.Rptr. 165, 369 P.2d 714, pet. cert. dismissed

(1963), 372 U.S. 933, 83 S.Ct. 885, 9 L.Ed.2d 769; McCormick,

Evidence, 2d Ed., §157 at 344. See Michigan v. Tucker

(1974), 417 U.S. 4̶3̶6̶, 433 94 S.Ct. 2357, 41 L.Ed.2d 182; Har-

rison v. United States (1968), 392 U.S. 219, 88 S.Ct. 2008,

20 L.Ed.2d 1047; United States v. Massey (M.D. Fla. 1977),

437 F.Supp. 843.

> As stated by the United States Supreme Court:

> "The essence of a provision forbidding the acqui-
> sition of evidence in a certain way is not merely
> that evidence so acquired may not be used before
> the court, but that it may not be used at all."
> Silverthorne Lumber Co. v. United States (1920),
> 251 U.S. 385, 392, 40 S.Ct. 182, 183, 1̶4̶ 64 L.ed.
> 319, 321.

The fruit of the poisonous tree doctrine is most often re-

ferred to in conjunction with searches and seizures. Most

courts considering the rule as it relates to inadmissible

confessions have analyzed it along the same line as the

general rule; i.e., if the physical evidence is a fruit of

the constitutional violation, it must be excluded. See

State v. Lekas, supra; see generally, McCormick, Evidence,

2d Ed., §157 at 344. In People v. Ditson, supra, the Cali-

fornia Supreme Court undertook an extensive discussion of

the rule and concluded:

"It appears to us to follow that if it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him in the form of an involuntary confession, that sense of fair play and decency is no less offended when a defendant is convicted by real evidence which the police have discovered essentially by virtue of having extorted such a confession. If the one amounts to a denial of a fair trial and due process of law, so must the other. If the one is the inadmissible product of 'police procedure which violates the basic notions of our accusatorial mode of prosecuting crime' (Watts v. Indiana (1949), supra, 338 U.S. 49, 55, 69 S.Ct. 1327, 93 L.Ed. 1801), so must the other be. It does not appear that we can draw a constitutionally valid distinction between the two." Ditson, 20 Cal.Rptr. at 178, 369 P.2d at 727.

We abide in the result reached by the above-cited authorities and hold the fruits of the confession inadmissible. The fruits in this case include the .22 derringer identified as the murder weapon, the bullets and pouch found with the weapon, a copy of the firearm registration defendant filled out when he bought the gun, photographs of the gun, the fingerprint found thereon, and the testimony matching the ballistics of the gun to the ballistics of the weapon with which the crimes were committed.

There are three general exceptions to exclusion of the fruit of the poisonous tree. (1) If the evidence is attenuated from the constitutional violation so as to remove its primary taint, it will be admissible. Wong Sun, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455. (2) If the evidence is obtained from a source independent of the defendant's confession, it will be admissible. Silverthorne Lumber Co. v. United States, 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321. (3) If it is inevitable that the evidence would have been discovered apart from the defendant's confession, it is admissible. Government of Virgin Islands v. Gereau (3rd Cir. 1974), 502 F.2d 914, 927-28. None of these exceptions apply to the instant facts.

The description of the pistol's location in the confession and the temporal proximity of the confession to the discovery of the gun precludes any assertion that obtaining the fruit is attenuated from the constitutional violation. The fact that Allies himself directed the police to the pistol disposes of any argument to the effect that it was actually obtained from an independent source. Kathy Terry, the only person who had knowledge of the concealment (as opposed to the discovery) of the pistol testified:

> "Q. Right now, can you recall that you actually saw the derringer on the day you went to bury the guns? A. I did. They were both in the same box.

> "Q. Did you see into the box? A. When he was getting it ready, they were both in the same box. And I walked into the kitchen. And when I returned the box had already been closed and taped. And that is the last time I saw them. We buried them after that."

She went on to describe how the box had been hidden beneath a rock. On December 12, before Allies confessed, she led police officers to the location where the box was concealed. The only gun found therein was a 9 mm pistol. Kathy Terry's evidence up to that point is admissible; however, the murder weapon was unearthed at defendant's direction nearly half a mile away. As discussed above, the discovery of the derringer is a fruit of the excluded confession and inadmissible.

In applying the third exception, the inevitable discovery rule, courts must not lose sight of the protections guaranteed by the Constitution. To avoid deciding cases on a judge's speculation as to what the police "might," "could" or "should" have done, it must appear that the evidence would have been obtained even in the absence of information received in violation of a defendant's rights. It must

appear that, as certainly as night follows day, the evidence would have been discovered without reference to the violation of the defendant's rights. The evidence in this case could not conceivably support such a finding.

Due to the illegality of the method used in obtaining defendant's confession, we have no choice but to reverse and remand the case to the District Court for a new trial. In deciding this case, we have not created new law; we have merely applied existing legal and constitutional principles.

The opinion of this Court is not entered lightly. The crimes for which defendant was convicted were senseless and brutal and, as in Brewer v. Williams (1977), 430 U.S. 387, 406, 97 S.Ct. 1232, 1243, 51 L.Ed.2d 424, 441:

> ". . . call[ed] for swift and energetic action by the police to apprehend the perpetrator and gather evidence with which he could be convicted. No mission of law enforcement officials is more important. Yet, '[d]isinterested zeal for the public good does not assure either wisdom or right in the methods it pursues.' Haley v. Ohio [1948], 332 U.S. 596, 605, 68 S.Ct. 302, 306, 92 L.Ed. 224 (Frankfurter, J., concurring in judgment). . . The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder . . . But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all."

In view of our holding that this case must be returned to the District Court for retrial, we direct our attention to defendant's second issue and find it meritorious:

PHOTOGRAPHIC EVIDENCE

Defendant contends that the photographs of the victims introduced at trial were gruesome, inflammatory and unduly prejudicial and that, on this ground alone, he is entitled to a new trial. We agree.

"'. . .[photographs] are admissible for the pur-
pose of explaining and applying the evidence
and assisting the court and jury in understanding
the case.'

"Photographs that are calculated to arouse the
sympathies of the jury are properly excluded,
particularly if they are not substantially
necessary or instructive to show material
facts or condition."  State v. Bischert (1957),
131 Mont. 152, 159, 308 P.2d 969, 973.

See also Rule 403, Mont.R.Evid.

The pictures admitted here are extremely gruesome and quite capable of inflaming the minds of the jury and engendering prejudice.  They were admitted for use by the State's pathologist in identifying the victims, demonstrating the position of the bodies, and establishing the cause of death. Because this could have been and was established without the use of the photographs, their probative value is low.  The trial court erred in allowing their introduction.

We have reviewed all other issues raised and find them without merit.

As part of our disposition of this case, we note it is not a civil action brought under Chapter 21, Title 53, Montana Code Annotated, seeking to have an individual committed to a mental institution.  Rather, it is a criminal prosecution for capital offenses in which concern with the defendant's mental state was limited to determining his fitness to stand trial and his legal ability to commit a crime.  These issues figured prominently in the case and, if this were a proceeding for civil commitment, there would be substantial credible evidence upon which to base a finding that defendant is a dangerous individual who cannot safely exist in our law abiding society.  This being a criminal appeal in which defendant's danger to society was not reached under Chapter 21, Title 53, we do not rule on that issue.

As an appellate court, we do not undertake to resolve the question.

In issuing our decision we recognize a basic duty not to unnecessarily endanger the safety of the people of this state. In case the State decides further prosecution of the case is not possible, we find that the evidence presented in this case points to defendant's danger to society and feel that an "emergency situation" would exist under section 53-21-129, MCA. Cf. Smallwood v. Warden, Maryland Penitentiary (4th Cir. 1966), 367 F.2d 945. The statute provides:

> "(1) When an emergency situation exists, a peace officer may take any person who appears to be seriously mentally ill and as a result of serious mental illness to be a danger to others or to himself into custody only for sufficient time to contact a professional person for emergency evaluation. If possible, a professional person should be called prior to taking the person into custody.

> "(2) If the professional person agrees that the person detained appears to be seriously mentally ill and that an emergency situation exists, then the person may be detained and treated until the next regular business day. At that time, the professional person shall release the detained person or file his findings with the county attorney who, if he determines probable cause to exist, shall file the petition provided for in 53-21-121 through 53-21-126 in the county of the respondent's residence. In either case, the professional person shall file a report with the court explaining his actions."

In this instance, Allies is currently in custody. Therefore, in the event the State declines to prosecute on remand, we order that his detainment be continued for a time period sufficient for an emergency evaluation under the above-quoted statute. From this point, the statutes are clear on the procedure to be followed. Sections 53-21-121 et seq., MCA; Comment, 38 Mont.L.R. 307 (1977).

The District Court is reversed, and the case is remanded for a new trial.  Defendant is to be detained pursuant to the last part of this opinion.

_____
                Justice

We concur:

_____
        Chief Justice

_____
        Justices

Honorable Peter G. Meloy, District Judge, sitting in place of Mr. Justice John C. Sheehy

-25-

Mr. Chief Justice Haswell, concurring in part and dissenting in part:

I concur in the reversal of defendant's conviction for the reasons stated in the majority opinion. I dissent from granting a new trial.

The essence of our criminal law is that a man may not be convicted of committing a crime unless it is proved beyond a reasonable doubt that he did so. In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L Ed 2d 368; State v. McWilliams (1936), 102 Mont. 313, 57 P.2d 788. Upon reviewing the sufficiency of the evidence to sustain a conviction, we do not pass on the credibility of the witnesses or the weight to be given their testimony as such matters are the sole province of the jury. State v. De-George (1977), 173 Mont. 35, 566 P.2d 59, 60, 34 St.Rep. 541, 543; State v. Bouldin (1969), 153 Mont. 276, 284, 456 P.2d 830, 834-835. Rather, we view the evidence in the light most favorable to the state and affirm the verdict of the jury if there is substantial credible evidence to support it. Glasser v. United States (1942), 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L Ed 680, 704; State v. Pascgo (1977), 173 Mont. 121, 566 P.2d 802, 805, 34 St.Rep. 657, 660. If a case is reversed solely for insufficiency of the evidence and then remanded for retrial, the defendant is unconstitutionally subjected to double jeopardy. U. S. Const., Amend. XIV; Burks v. United States (1978), 437 U.S. 1, 98 S.Ct. 2141, 57 L Ed 2d 1; 1972 Mont. Const., Art. II, §25.

In this case, the conviction is reversed because a portion of the evidence used at trial was obtained in violation of the defendant's constitutional rights. The United States Supreme Court has not yet answered the question of whether a defendant is subjected to double jeopardy upon retrial when the reviewing court has decided the "legally competent evidence adduced at the first trial was insufficient to prove guilt." Greene v. Massey (1978),

- 26 -

437 U.S. 19, 26, 98 S.Ct. 2151, 2155, 57 L Ed 2d 15, 22, n. 9.

The Montana Supreme Court however, has decided the question and held that a new trial cannot be granted when admissible evidence from the first trial will not support a conviction. State v. Johnson (1978), ___Mont.___, 580 P.2d 1387, 1390, 35 St.Rep. 952, 956; State v. Langen (1968), 151 Mont. 558, 568, 445 P.2d 565, 570. This is a sound rule and one from which the Court should not deviate. By ruling otherwise, the prosecution is afforded another opportunity to supply evidence which it failed to muster at the first proceeding. This is precisely what the double jeopardy clause forbids. Burks v. United States, supra, 437 U.S. at 11, 98 S.Ct. at 2147, 57 L Ed 2d at 9; see generally Note, 10 Tex. Tech. L.R. 184 (1978).

The legally admissible evidence at defendant's trial showed the following: That defendant owned and sometimes carried a small caliber pistol; that his girlfriend did not see the gun on the day the homicides were committed; that defendant was not at home at the time they were committed; that defendant may have buried the pistol; and that .22 caliber bullets were found in his van. In addition, defendant knew the homicide victims and had been at their home hours before their deaths. A man, not positively identified, had been seen walking down an alley near the scene of the crimes at about the time the murders were committed. Finally a van, similar to, but said positively not to be defendant's by the only person who saw it, was seen near the victims' home and was driven away shortly after the homicides were perpetrated. This is not sufficient to support a conviction and a new trial cannot be granted. State v. Johnson, ___Mont.___, 580 P.2d at 1390, 35 St.Rep. at 956.

I agree with the majority that the psychiatric testimony shows defendant to be a very disturbed individual and that his

release would present a danger to society as well as to himself.  I would therefore order him detained under Chapter 21, Title 53, MCA and direct proceedings to be commenced under that chapter to procure defendant's commitment to a mental institution.

_____
Chief Justice

Mr. Justice Daniel J. Shea will file a separate opinion later.

SEPARATE CONCURRING OPINION AND

DISSENT

------------------

MR. JUSTICE DANIEL J. SHEA

------------------

STATE OF MONTANA,

      Plaintiff and Respondent,

   vs.

GUY JOHN ALLIES,

      Defendant and Appellant.

FILED

JAN 10 1980

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

------------------

January 10, 1980

------------------

Mr. Justice Daniel J. Shea concurring in part and dissenting in part.

I concur in the majority opinion that defendant's conviction must be reversed. I agree, on the other hand, with the dissent of Chief Justice Haswell that principles of double jeopardy, as applied to the factual circumstances of this case, require that the case be dismissed rather than simply granting a new trial.

Although I agree with the main opinion that unconstitutional methods were used to extract the confession from defendant, I would not focus, as the main opinion has, on the administering of sodium amytal (truth serum) as being the pivotal or crucial issue. The main opinion has failed to focus on two crucial issues surrounding the circumstances of defendant's confession. The first is the effect of the arrest of the defendant on the drug charges and the legal consequences which flow from using this arrest as the "tool" by which to launch a more intensive homicide interrogation. The second is the effect of the denial of defendant's constitutional right to counsel after he was arrested, appeared before the justice court on the drug charges, and requested that an attorney be appointed for him. Legal consequences surely flow from the continued interrogation of the defendant after he was in custody and had requested an attorney.

In addition to the above, since the majority has chosen to grant a new trial to defendant, there are other issues raised by the defendant which should have been discussed and decided by the majority, and the issue of speedy trial, in particular, should have been discussed and decided.

Insofar as the double jeopardy issue is concerned (new trial versus dismissal), Chief Justice Haswell has cited two cases decided by this Court which hold that if the admissible evidence will not support a conviction, a new trial cannot be

-29-

granted. State v. Johnson (1978), ___ Mont. ___, 580 P.2d 1387, 1390, 35 St.Rep. 952, 956; State v. Langan (1968), 151 Mont. 558, 568, 445 P.2d 565, 570. If the majority thought that these cases should be overruled, then the majority should have overruled them. It adds nothing to the law of this State to simply pass over these cases as though they did not exist. Casting the illegally admitted evidence aside, it is our duty to determine if there still exists in the case, admissible evidence which would permit the prosecution to submit the case to the jury for its decision. I agree with Chief Justice Haswell that there was insufficient evidence, thus, under double jeopardy principles, the case must be dismissed.

"OTHER ISSUES RAISED BY THE DEFENDANT

The defendant raised several other issues in addition to those directly relating to the confession. Briefly stated, those issues are: (1) that defendant was denied a speedy trial; (2) that photographic evidence of the victims' bodies unduly inflamed the passions of the jury; (3) that Dr. Hughett should not have been permitted to testify to defendant's mental condition; (4) that a ballistics expert should have been appointed for the defendant as he had requested; (5) that a change of venue should have been granted; (6) that trial judge prejudice necessitates the granting of a new trial; (7) that, if nothing else, the cumulative error doctrine requires the granting of a new trial; and, (8) that the mental disease or defect statutes are unconstitutional.

Before briefly discussing these issues, I emphasize that the position taken by both Chief Justice Haswell and myself-- that is, that double jeopardy principles require a dismissal-- would not require the Court to discuss any of the remaining issues for the case would be over. But that situation is drastically changed where, as the majority has done here, a new trial has

-30-

As to the remaining issues raised by the defendant, the majority opinion passes them off with this cavalier statement: "We have reviewed all other issues raised and find them without merit." If any statement is likely to get us in trouble with the Federal Courts at a later time, one such as this surely will. The issues, and particularly the speedy trial issue, cannot be disposed of that easily.

The issues of change of venue and cumulative error are clearly moot. The issue of trial judge prejudice can also be determined as moot unless the majority should want to address the issue because the same trial judge who presided over the first trial may also preside over the second trial. Perhaps the majority should consider whether the facts of the trial record demonstrate that he should not sit again upon the retrial.

The issue of constitutionality of the mental disease or defect states can be treated as being moot, although this Court may again be faced with this same issue if defendant is convicted again and those statutes are again involved at the trial of the case.

Because a new trial has been ordered, the majority opinion should have addressed the question of whether or not Dr. Hughett should have been permitted to testify to defendant's mental condition. The statement of this issue in the opinion leaves the reader in a muddle as to what the issue actually is. Impliedly, one can argue that this Court ruled against the defendant, but if one does not know precisely what the issue is, how can the trial courts and lawyers ever know what has been decided.

It is also possible that ballistics may be an issue again at the retrial. Since defendant was denied the right to have a ballistics expert appointed to aid in his defense, perhaps

been granted. I will not address the merits of these issues,
but simply point out some defects in the majority opinion.

Other than the main suppression issue, the only issue
discussed by the majority, and that very briefly, is the
issue of claimed error in admitting photographs of the bodies.
The majority has ruled that the pictures are unduly gruesome
or inflammatory and should not be admitted at the second trial.
It also appears that the majority, even if it held against
the defendant on all other issues, ruled that the admission of
the pictures in and of itself required the grant of a new trial.
With this I do not agree.

There is no doubt that the prosecution could have gotten
along quite well without the pictures--they certainly were
not needed. On the other hand, I have never thought that the
prosecution must always present a sanitized version of the
facts to the jury. Here, the defendant was charged with
deliberate homicide and the jury convicted him of mitigated
deliberate homicide. This, if nothing else, is an indication
that the jury was not unduly swayed by the pictures. But
what really bothers me on the issue of photographs is the
fact that there is utterly no consistency in this Court with
regard to pictures. Here, the court ruled that a new trial
was deserved on the issue of the photographs alone. I note,
however, that the pictures admitted into evidence here cannot
hold a candle to the gruesomeness of the pictures admitted in
the case of State v. McKenzie (1978), _____ Mont. _____, 581
P.2d 1205, at 1218/, 35 St.Rep. 759, at 774, and yet the
1219
Court there, without even indicating what the pictures depicted,
held them not prejudicial. I only emphasize this to point
out that there seems to be no rhyme or reason to this Court's
position on photographic evidence of homicide victims.

-31-

the majority opinion should have more properly disposed of this issue in the opinion. Again, the majority opinion did not state the precise issue alleged in relation to the ballistics problem, and therefore the opinion provides no guidance to trial judges or lawyers.

But most important of all in terms of the ultimate effect on the defendant, is the speedy trial issue. This issue is not moot and the majority has an obligation to discuss it on the merits. The crimes took place on November 11, 1976, homicide charges were filed on December 12, 1976, and trial took place on January 16, 1978, more than thirteen months later. Defendant concedes that time taken in his attempts to secure a writ of supervisory control should not run against the State, but even on this basis, the time lapse between charges and trial is 10 months and 17 days. In Fitzpatrick v. Crist (1974), 165 Mont. 382, 528 P.2d 1322, this Court held a 7 month delay sufficient to shift the burden to the State to explain the delay and show an absence of prejudice. And although we have held that there is no precise lapse of time sufficient to give rise to presumptive prejudice (State v. Cassidy (1978), ___ Mont. ____, 578 P.2d 735, 35 St.Rep. 612, 615), undoubtedly the delay of over 10 months here (conceding defendant's acknowledgment that the delay taken in the attempts to secure a writ of supervisory control from this Court should not be counted against the State) is sufficient to trigger an inquiry and shift the burden to the State to prove an absence of prejudice.

This duty to examine the facts and circumstances surrounding the time lapse between charges and trial must be decided on the merits. The reason is obvious: If this Court should conclude that defendant had been denied a speedy trial, the result would not be a new trial, it would be a dismissal.

-33-

Since a resolution of the speedy trial issue in defendant's favor would put an end to the prosecution, the majority cannot get away with simply making the bald conclusion (without stating and analyzing the facts in compliance with Barker v. Wingo (1972), 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101) that the issue has no merit. If this Court fails to do so, we will be ordered to do so by a Federal Court, and with total justification.

With regard to this speedy trial issue, I emphasize that I take no position. I simply point out that this issue must be discussed and decided by the majority, one way or the other.

Having pointed out these problems with the majority opinion on the "remaining issues", I turn now to my concurring opinion wherein I discuss the effect of the arrest on the drug charges in order to facilitate the homicide interrogations, and the effect of the failure to provide counsel to defendant after his arrest and after he requested the appointment of an attorney at his appearance before the justice of the peace.

The pretrial legal proceedings centered primarily around defendant's motion to suppress the confession and its fruits based on claims of constitutional rights. The hearing was long and involved, taking a total of five days. At the conclusion of the hearing the trial court took the matter under advisement. It did this on July 11, 1977. On July 25, 1977, the trial court, without an attempt to analyze the issues and evidence presented in relation to those issues, and without even entering findings of fact and conclusions of law, entered the following all encompassing order denying the defendant's motion to suppress;

> "The Court finds the statements made by Defendant, including all confessions exculpatory and inculpatory, were made voluntarily by the Defendant, without any doubt by the Court."

The main opinion has also quoted this bald-conclusory
statement.  Suffice to say that we are provided no insight
whatsoever into the trial court's analysis of the issues
and application of the law to the facts presented at the
motion to suppress.  Nothing can be more frustrating to
lawyers when a judge makes such a ruling; and nothing is
more meaningless to an appellate court when we are called
upon to review the decisions and actions of the trial courts.
How can we tell whether the trial court conscientiously
attempted to make a good faith decision based upon the evidence
and the law when no underlying basis is provided to us by
which we can make that determination?  Under these circumstances,
the presumption of regularity of a trial court's decision
should evaporate the instant such a bald conclusion is made
disposing of all the issues raised.

Why are not the litigants and the public entitled to
know the basis upon which the trial court set forth the issues,
analyzed the evidence, and applied the law to the facts as
the trial court perceived the facts to be?  Is this too much
to ask?

Although the main opinion has concentrated on the
methods used in obtaining the confession as being coercive,
and constitutionally repugnant, thereby rendering the confession
involuntary, I note that the opinion has not sufficiently
considered two additional grounds which independently, are
serious enough to invalidate the confession.  The confession
here was tainted by the initial illegal investigatory arrest
ostensibly/on drug charges, which taint continued, unabated
throughout the four day period that defendant was subjected
to the interrogation techniques so soundly condemned by the
main opinion.  Moreover, during this same period of time,
and after he had requested the appointment of counsel at the

-35-

justice court appearance on Friday morning, he was denied counsel until after the confession was extracted on Sunday morning and he appeared in District Court to answer to the homicide charges. The legal consequences which flow from this illegal investigatory arrest and the denial of counsel are such that the arrest and denial of counsel served as the launching pad from which the State took a four day holiday with defendant's constitutional rights.

THE LEGAL CONSEQUENCES FLOWING FROM AN ILLEGAL ARREST:

It is abundantly clear that had the defendant not been arrested and held in custody, the agents of the State would not have been able to subject him to the interrogation techniques used on him over a four day period until the confession was finally extracted on Sunday morning. It was therefore essential for the State agents to have defendant in their custody. Indeed, even before defendant was formally arrested on the drug charges, he had been held in a 12' by 12' room where he had been interrogated for four hours by the police, and the police guarded this room while two of the interrogating officers went to search defendant's home and van. The police knew, however, that they could not continue to hold the defendant under such circumstances without getting into deep legal trouble. Accordingly, they had to fashion a basis upon which they could arrest him, and thus "legally" have defendant in their custody. Hence the arrest on drug charges.

One of the main contentions of defense counsel is that the arrest, ostensibly on drug charges, was an illegal investigatory arrest, used only as a means by which interrogation of defendant on the homicide charges could be intensified. Essential to this contention is the nature of the consent which defendant gave to the police to search his home and van.

-36-

He claims that the police expressly or impliedly told him that if they discovered drugs while in the process of searching for evidence linking him to the homicides, that they would not arrest or charge him based upon such discovery of drugs.

Another legal consequence which follows from an illegal investigatory arrest, is the effect of this arrest on the right to counsel. If the drug arrest and charges could be sustained, defendant was obviously entitled to counsel on the drug charges. On the other hand, if it was an illegal investigatory arrest, aimed at assuring continuity of an in-custody interrogation in relation to the homicides, the confession cannot be admitted if it is at all tainted by this arrest. Moreover, if the arrest was actually one to facilitate the homicide interrogation, defendant, upon that arrest, was entitled to have counsel appointed for him to represent him in relation to the homicides.

In answering the defendant's arguments, the State argues first that the arrest on the drug charges was legal and therefore that a prosecution on the drug charges could legally follow. In essence, the State argues that defendant's consent given to the police to search his home and van was a general blanket consent and that agents of the State did not tell defendant that he would not be arrested or prosecuted for drug possession if drugs were found in his home or in his van. Based on this assumption of legality, the State then argues that although counsel was not provided to defendant on the drug charges, and even though he had requested counsel at his justice court appearance, his rights were not prejudiced by the denial of counsel because its agents did not interrogate defendant on the drug charges after his arrest and appearance in justice court.

-37-

The State then proceeds to the third prong of its contention that the arrest on the drug charges was legal. The State argues that because defendant was not in custody on homicide charges, but only on the drug charges, its agents therefore had a right to interrogate defendant concerning the homicides. For this theory of interrogation, the State relies on the unrelated offense doctrine set forth in United States v. Dowells (9th Cir. 1969), 415 F.2d 801, but the facts of the Dowells case have absolutely no application to the facts of this case.

The State comes up with another argument in the event that this Court should hold that the drug arrest was an illegal investagatory arrest. It argues that probable cause did in fact exist to arrest on the homicides, and that even if the police did not recognize they had probable cause and did not rely on the homicide offense as the basis for making the arrest, the arrest can nonetheless be sustained. For this theory, the State relies on United States v. Saunders (5th Cir. 1973), 476 F.2d 5:

> "When an officer makes an arrest which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on the offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." 476 F.2d at 8.

Translated, this is a conversion of a rule too often used by appellate courts when the trial court has entered a judgment which, for some reason, can be sustained, but for which the trial court has assigned the wrong reasons in entering the judgment. Applied here, the rule means that as long as the police had probable cause to arrest on some offense, even though they were unaware of the existence of such probable cause, the arrest will be sustained.

Assuming the propriety and viability of such a rule in this State, it assumes that there was probable cause to

-38-

make the arrest for the homicides. In addition, if one assumes such probable cause to arrest for the homicides, defendant's right to counsel on those charges attached immediately, and it was the State's duty, if defendant could not obtain his own counsel, to obtain counsel for him. Thus when he was arraigned on Friday morning on the drug charges, it was the State's duty to provide counsel to defendant on the homicide charges. The State cannot obtain the benefit of an alternative theory of arrest to avoid a conclusion that it was illegal and by the same process avoid the duties which attach as a result of receiving the benefits of this alternative theory of arrest. By persisting in its questioning of defendant after his right to counsel had attached by his assertion of such right, the State proceeded for the following three days at its own risk, knowing full well that it was depriving the defendant of his constitutional right to counsel.

But neither of the alternative theories of the State can be factually sustained. The arrest cannot be validated on the theory that objective probable cause existed to arrest on the homicides even though the police subjectively relied on probable cause to arrest on the basis of illegal drug possession. The simple reason is that probable cause did not exist to arrest on the homicides. Assuming a valid arrest on the drug possession charge, the unrelated offense doctrine, as relied on by the State, cannot, under the facts of this case, free the State to interrogate defendant in relation to the homicides. And last, but not least, the evidence does not justify a conclusion that the initial arrest for drug possession was valid.

Concerning the assertion of probable cause to arrest for the homicides: All the police knew was that defendant once owned a small caliber pistol; that he knew the victims

-39-

and had been at the scene of the crimes within eighteen hours of its commission; and, that he had altered his alibi. These factors would arouse suspicion, but they do not constitute probable cause to make an arrest based on the conclusion that defendant had committed the homicides. Probable cause is determined by whether or not the officers had such information to warrant a man of reasonable caution in the belief that defendant had committed the crimes. State v. Hill (1976), 170 Mont. 71, 74, 550 P.2d 390, 392: section 46-6-401, MCA. See also Draper v. United States (1959), 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. A good faith belief, absent the factual foundation, does not fulfill this requirement.

Assuming moreover, that probable cause did exist to arrest defendant on the homicides, the State then had an obligation to provide counsel to defendant to represent him on the homicide charges, and had no right to hold defendant incommunicado for three more days while subjecting him to the procedures which eventually extracted the confession. Briefly stated, the State cannot have the best of two worlds.

In seeking to validate its continual and persistent interrogation of defendant after his arrest and appearance before the justice of the peace and his request for an attorney, the State must cross two hurdles. First, it must establish that defendant's consent to the search of his home and van permitted them not only to seize drugs, but also to arrest and charge him for possession of drugs. Second, assuming the right to arrest and charge him with drug possession, it must establish that the unrelated offense doctrine applies in order to validate the interrogation of defendant on the homicide offenses while he was in custody on the drug charges. The State fails on both counts.

The evidence does not support a conclusion that defendant gave his consent to search for drugs knowing that if any were found that he would be arrested and charged with drug possession. Rather, it supports a conclusion that defendant thought he would not be arrested for drug possession in the event drugs were discovered while the police were engaged in a search for evidence connecting defendant to the homicides.

As stated by the county attorney during the hearing of this appeal, the police and his office were under tremendous pressure from the public and the press to solve the homicide case as soon as possible and bring the perpetrator to justice. While investigating the case the police had generally let it be known that no drug-related arrests or prosecutions would come about in relation to information anyone gave to them in connection with the homicide investigation. The record does not disclose whether defendant was aware of this general drug charge leniency extended to the public in the hopes of acquiring information relating to the homicides. But two factors relate directly to the defendant's situation. On November 22, Detective Hirischi told defendant that he would not be arrested on drug charges stemming from his dealings with the Tillotsons which could be brought as a result of his cooperation in the homicide investigation. On December 9, the day defendant signed the consent form to search his home and van, officer Trimarco told him that they were "not interested in" or "too concerned" with drugs, but rather, were after the instrumentalities of fruits of the homicides. Defendant then consented to the search of his home and van and signed a form containing the following language:

> "I have been advised that I do not have to give these officers permission to search my home and property. I am giving this consent without any threats or pressures of any type used against me."

An important factor here is that when defendant signed the consent to search he was in fact already in the custody of the police although he had not been formally arrested. Officers had just previously interrogated him for four hours in a 12 foot by 12 foot room, and he was left there guarded by two other officers while the interrogating officers went to search his home and van for evidence connecting him to the homicides. Defendant testified that while under guard he asked the guarding officers when he would be permitted to see an attorney and that one officer told him to wait until officers Bell and Trimarco returned from the search of defendant's home and van. The officer denies that defendant made this request. Defendant was held totally incommunicado except for a brief visit by his girl friend which lasted for a period of five or ten minutes.

If the consent was not coercive or obtained by trickery, at the very least the scope of the consent was limited to the fruits or instrumentalities used in the homicides. Though the drugs could properly be seized as contraband, the arrest and criminal charges based upon that seizure, was outside the scope of the permission granted, and therefore was illegal. LaFave, Search and Seizure, Vol. 2, §8.1(c) at 627, et seq. It is repugnant to our system of justice, federal and state, to allow the police to express or imply that a suspect will not be arrested on drug charges if evidence of drug use or possession is uncovered in a consent search for the fruits or instrumentalities of a homicide, and then, after the consent is obtained and drugs uncovered during the search, to arrest and charge defendant with criminal possession of drugs. A holding to the contrary would mean that the consent would mean precisely what the police intended it to mean--which is most often a convenient after the fact determination made in order to give some credibility to or justify the previous action of the police.

The facts of this case do not permit a conclusion that defendant gave a blanket consent with full knowledge that if drugs were discovered a drug prosecution against him would result. Defendant had just been interrogated for four hours in relation to the homicides, and he obviously was well aware that the police, in asking his consent to search, were looking for evidence connecting him to the homicides. A blanket consent is not given where the defendant is told by the police as part of the process of obtaining that consent, that they are "not interested in" or not "too concerned" with drugs, but rather, are looking for evidence connecting him to the homicides. Here, if not expressly stated, it was at least implied that he would not be arrested and charged with drug possession if drugs were found in the process of the search. Where items are seized which go beyond the scope of the consent given by a defendant, a successful arrest and prosecution based on those items seized cannot pass constitutional muster. United States v. Marchand (2nd Cir. 1977), 554 F.2d 983, cert. den. (1978), 434 U.S. 1015, 98 S.Ct. 732, 55 L.Ed.2d 760; Sheff v. State (Fla. 1976), 329 So.2d 270; Commonwealth v. Weiss (Mass. 1976), 348 N.E.2d 787; LaFave, Search and Seizure, Vol. 3, §11.4(e), at 646, et seq.

Under the circumstances here it matters little whether the contraband (drugs) was in plain view and thus seizable under the plain view doctrine (Coolidge v. New Hampshire (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564) based upon an initial consent to search (United States. v. Dichiarinte (7th Cir. 1971), 445 F.2d 126), for defendant was expressly or impliedly promised that a drug charge would not ensue from their discovery of drugs in his home or in his van. To dignify the arrest for drug possession as "legal" under the circumstances here would be an insult to our judicial system and the values it embodies.

-43-

Although there is no basis to conclude that the State legally arrested the defendant on drug charges, a determination that it was a valid arrest must first be made before the State's theory of questioning defendant under the unrelated offense doctrine can come into play. In disposing of this theory, I will assume therefore that the defendant was validly arrested on the drug charges. The question then presented is whether the State had the right to interrogate defendant on the homicide charges without providing counsel to him. Only by assuming that this doctrine can properly be applied to this case does the State have any chance of defeating defendant's claim that his right to counsel on the homicide case attached at the moment of his arrest.

The case upon which the State relies is United States v. Dowells (9th Cir. 1969), 415 F.2d 801. But Dowells provides no support for the State's position. There the defendant was arraigned on a robbery charge. He requested an attorney, one was appointed for him, and he did in fact talk to his attorney. Later, while in jail awaiting trial, government agents approached defendant to question him about a totally unrelated robbery. They gave defendant his full Miranda warnings and then defendant read and signed a waiver of his right to counsel. He then confessed to committing the unrelated robbery. There is no indication whatsoever in this case that the arrest on the first robbery charge was merely a tool to secure a custodial interrogation on the unrelated robbery charge. Furthermore, defendant had been appointed an attorney with regard to the first charge and was fully aware that he could consult with one concerning the unrelated robbery. Instead, he waived his rights to counsel and then confessed to the second robbery. These facts do not come close to the facts of the present case.

-44-

also obtained a consent to search from the person who owned the home only after assuring him that they were "not interested" in drugs. By the time defendant signed this consent the homicide investigation was intensely and exclusively focused on him as being the perpetrator of the homicides. At this point, however, all police officers who testified on this matter, agreed that they did not have probable cause to arrest defendant on the homicides. Thus the need arose to put him into custody on another charge so that defendant could be interrogated in isolation, without danger of interruption or interference. The fact that bail on the drug charges was set at $30,000 is indicative that the police had other objectives in mind and did not want him to immediately post bail. Finally, shortly after the homicide charges were filed, the prosecution dismissed the drug charges by entering into a stipulation with defense counsel, even though defense counsel did not request this dismissal.

The action of State agents after defendant's appearance in justice court, adds additional support for this conclusion. Although defendant had requested an attorney in justice court no one told him when he might make his appearance in District Court to obtain a lawyer. If the county attorney, moreover, was truly interested in protecting defendant's rights to counsel, nothing prevented him from filing charges in District Court on Friday, and thus securing defendant's right to counsel. It was not a difficult matter to prepare the necessary papers in District Court permitting the drug charges to be filed directly there. Instead, however, after his justice court appearance, defendant was held in complete isolation in a hostile police-dominated atmosphere until the police finally extracted his confession on Sunday morning.

Here, the police knew and fully acknowledged that the arrest on drugs was made only to facilitate the homicide interrogation. Indeed, they admitted that the drug arrest was merely a "tool" to aid in the homicide investigation. And there can be no question that defendant must have known that agents of the State were not looking for evidence of drug possession but rather, were looking for evidence connecting him to te homicides. Before his arrest he had been intensely questioned on several occasions concerning the homicides, and indeed, was still in police custody as part of the homicide interrogation when he executed the consent to search and when he was arrested on the drug charges. To recognize and apply the unrelated offense doctrine to the facts of this case would be to flatly deny to defendant his constitutional right to counsel. Under these circumstances, the State cannot contend in good conscience that defendant's request for an attorney at the justice court appearance did not constitute a request for an attorney in relation to the homicides. Furthermore, since the State knew that the arrest and defendant's custody facilitated an immediate and unremitting interrogation process lasting for three more days, the State is in no position to contend that defendant's arrest did not trigger his right to counsel in the homicide case.

The police officer who made the drug arrest admitted during cross-examination that it was done as a "tool" or as "part of" the homicide investigation. Defendant, moreover, was not the only person who could have been charged with drug possession in relation to the drugs found in the home. But no other person was charged. Defendant's girl friend lived with him and no doubt had equal access to the drugs. And, after defendant signed the consent to search, the police

Indeed, shortly after his justice court appearance he was taken to meet with the Yellowstone County Attorney and the only item on the agenda was the homicides. The county attorney suggested that defendant submit himself to a sodium amytal treatment. The sole objct of the State after obtaining defendant's custody through the drug charges, was to isolate and interrogate him so that they could obtain his confession. That the State chose to do so in flagrant disregard of the defendant's constitutional rights is a burden which the State alone must bear, for it was not required to choose this course of action.

Although the main opinion has focused primarily on the interrogation techniques which rendered the confession admissible, it has, at least in passing, concluded that defendant's conviction must also be reversed because he was denied his right to counsel. But the opinion does not develop this aspect of the case and I am not at all certain just where the majority concludes that defendant's right to counsel first attached. Just as we cannot ignore the consequences which flow from the illegal arrest, we cannot ignore the consequences which flow from the State depriving the defendant of his right to counsel.

Defendant requested an attorney in justice court when he appeared there on Friday morning, ostensibly in response to the drug charges, and after being advised of his rights, including his right to counsel, he requested that a lawyer be appointed for him. At no time did defendant ever expressly or impliedly waive an attorney until just before his formal confession on Sunday morning. Defendant's custody provided the necessary condition upon which the State commenced its four day holiday with defendant's constitutional rights, including his right to counsel.

-47-

At the hearing of this case on appeal, the Yellowstone County Attorney, in response to questions from the bench, explained the peculiar circumstances existing in Yellowstone County with regard to appointment of counsel on felony charges. If felony charges are filed against a defendant in justice court, the charges filed there serve merely as a holding device to give the State time to file the charges directly in District Court. The State rarely, if ever, allows the defendant to effectively assert his right in justice court to a preliminary hearing. In addition, however, although a defendant is advised of his right to counsel by the justice of the peace, he is also told that the justice of peace cannot appoint counsel for him, rather, that the defendant must wait until the county attorney takes the case to District Court before counsel can be appointed for him. In the present case, because defendant appeared in justice court on Friday morning, the county attorney explained that he did not have time to file charges that day in District Court, and therefore the following Monday would have been the earliest time he could have done so. The county attorney would not admit any constitutional defects, or statutory noncompliance in this customary practice in Yellowstone County. Presumably, he would have us believe that it is a mere coincidence that this practice in Yellowstone County fit in beautifully with the time frame which was needed to extract a confession from the defendant before he was taken to District Court for the appointment of counsel on the following Monday.

It is a total abdication of responsibility for the State to contend here that under the circumstances of the case, it did not deny counsel to defendant. Custody on the ostensible drug charge provided the essential control over defendant from

-48-

which agents of the State could work on him to extract a confession. One of the cardinal principles of Miranda v. Arizona is that once a defendant in custody asks for an attorney, that request must be "scrupulously honored." Miranda, 384 U.S. at 479, 85 S.Ct. at 1630, 16 L.Ed.2d at 726; Michigan v. Moseley (1975), 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321. The Miranda Court stated:

> "If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." Miranda, supra, 384 U.S. at 444-445, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.

And the Court further stated as to in-custody interrogation:

> "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." Miranda, supra, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723.

In this case, the facts pertinent to this issue speak for themselves--defendant's request for an attorney was completely ignored. There was not even an attempt to comply with the mandate of Miranda. Rather than being "scrupulously honored" defendant's request for an attorney was unscrupulously ignored.

In Powell v. Alabama (1932), 287 U.S. 45, 57, 53 S.Ct. 55-59, 77 L.Ed. 158, the United States Supreme Court, in reversing convictions because of a denial of counsel, first declared

-49-

that early access to an attorney is indispensible to a criminal defendant if he is to have the effective assistance of counsel to which he is entitled under the Sixth and Fourteenth Amendments of the United States Constitution. In Escobedo v. Illinois (1964), 378 U.S. 478, 488, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977, 984, the Court zeroed in on the stages at which the right to counsel must be honored. In declaring that most injustices and constitutional abuses occur during a defendant's initial contacts with the criminal justice system, the Court held that when an investigation turns from investigatory to accusatory, a defendant who invokes his right to counsel, must have that right respected. This Court recognized this basic right in State v. Lucero (1968), 151 Mont. 531, 537, 445 P.2d 731, at 734, where, in relying on Escobedo, we stated:

> "The constitutional right to counsel and the constitutional right against self-incrimination attach prior to any court proceeding at such time as the police investigation shifts from a general investigation of an unsolved crime to a focus on a particular suspect. (Citing Escobedo v. Illinois.)"

Furthermore, there can be no doubt that the United States Constitution mandates that the right to counsel attaches without question after the defendant has been charged:

> "Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth amendments means at least that a person is entitled to the help of a lawyer at or after the time judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Brewer v. Williams (1977), 430 U.S. at 398, 97 S.Ct. at 1239, 51 L.Ed.2d at 436.

Even before his formal arrest on the drug charges, the homicide investigation had clearly focused upon him and had become accusatory. Defendant testified that he requested an

-50-

attorney while the search of his home and van was conducted, but the officers deny this. Be that as it may, the State cannot and does not deny that defendant requested an attorney the following morning when he appeared before the justice of the peace. The arrest on drug charges served as the necessary "tool" by which full custodial control could be asserted over the defendant to facilitate the interrogation techniques found so offensive in the main opinion. After defendant's arrest, the total focus was on him as the perpetrator of the homicides. The only problem was that the State had no evidence upon which to base a prosecution without a confession and its fruits. There can be no doubt therefore, that when defendant appeared before the justice court and requested an attorney, he triggered the Escobedo request for an attorney. By persisting in the interrogation of defendant after his right to counsel attached, and had not been waived, the agents of the State proceeded at their own risk, with their only hope being that the judiciary would close its eyes to its violations of the defendant's constitutional rights.

IMPACT OF THE ILLEGAL ARREST, DENIAL OF RIGHT TO COUNSEL, AND ILLEGAL INTERROGATION TECHNIQUES:

We are thus back to square one. For the confession to be admissible it must not have been extracted by illegal means, for if it has been so extracted, it is not voluntary. That, in part, is the holding of the main opinion. The methods used to extract the confession are, of course, in and of themselves, sufficient to prevent the admissibility of a confession. But added to the methods used is the failure of the State to provide counsel to defendant and the exploitation of the illegal arrest from which the taint was never removed. The legal consequences which flow from the denial of counsel and the illegal arrest, cannot be ignored for they add significantly to the reasons why the confession and its fruits are not admissible at the trial.

The only theory by which the State can successfully avoid the issue of failure to provide counsel to defendant is not by a contention that it had no duty to provide him counsel once he asserted that right at his appearance before the justice of the peace, but that the defendant waived his right to counsel once it had been asserted. The State, however, must prove that this right was voluntarily and knowingly relinquished. Brewer v. Williams (1977), 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, 439; Johnson v. Zerbst (1938), 304 U.S. 458, 464, 58 S.Ct. 1010, 1023, 82 L.Ed. 1461, 1466. Not only is this the State's burden to prove, but the burden to prove defendant waived his right to counsel, is indeed a heavy one. Miranda, supra, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. No waiver was proved in this case.

There are absolutely no facts by which it can be determined that defendant expressly waived his right to counsel once it had been first asserted. And unless the continuing interrogation itself can be construed as an implied waiver of counsel, there are absolutely no facts by which an implied waiver could result. Not only would an implied waiver strip Miranda of its vitality, even where there is such a contention the State must prove upon such assertion, that defendant knew that the right existed and just what the right entailed. North Carolina v. Butler (1979), ____ U.S. ____, 99 S.Ct. 1755, 60 L.Ed.2d 286. It can hardly be asserted that defendant knew what the right entailed when he was told in justice court, after asserting his right to counsel, that he could not have counsel until his case reached District Court (whenever that time might be). The State admits that defendant asserted his right to counsel in justice court, and just as clearly, the State should admit that he did not thereafter waive his right to counsel.

-52-

Outside of the events themselves, there were no gestures or words which could be taken to manifest a voluntary and knowing waiver. More than mere participation is necessary. To rule otherwise would strip the principles underlying Miranda and Escobeda of their vitality and legitimize methods of interrogation which are abhorrent to our system of justice. It would sanction the continuing interrogation of a defendant after the right to counsel had been invoked, and the subject's participation in the interrogation would in itself constitute the factual foundation for a waiver of counsel. This is precisely what Miranda forbids.

Clearly therefore, the session with the county attorney in relation to the sodium amytal treatment, the sodium amytal interrogation by Dr. Hughett in the presence of the police officers, and the later interrogation by Dr. Hughett on Sunday morning, were all tainted by a flagrant violation of the defendant's constitutional right to counsel.

We arrive then at the situation immediately preceding the confession. Just before defendant confessed, and after he had been subjected to four days of interrogation in isolation, in a hostile police-dominated atmosphere, the police decided to employ the coup de grâce by then formally reading the Miranda warnings to him and obtaining a waiver of his rights. Presumably, they believe that this sanitized and legitimized all that had gone before. But a waiver obtained under such circumstances cannot wipe out the unremovable stain of the immediate unconstitutional past. The waiver must be looked at in the context of the entire proceedings which preceded it. A court cannot condemn the interrogation techniques used in this case, only to hold that the confession was nonetheless admissible because just before defendant confessed he was given his Miranda warnings

and waived his rights. Such a holding would make a mockery of the investigation and interrogation process and constitutes a license for state agents to do anything they pleased in prepping the defendant for the ultimate confession.

FRUIT OF THE POISONOUS TREE:

Without regard to a consideration of an illegal investigatory arrest or to a denial of the right to counsel, the majority has concluded that the confession, because of the interrogation techniques used, was involuntary, and thus inadmissible. Clearly, had there not been an illegal arrest or denial of counsel, the confession would still be rendered inadmissible, and I concur with the majority opinion in this regard. The fruit of the poisonous tree doctrine set forth in Wong Sun v. United States (1963), 371 U.S. 471, at 491, 83 S.Ct. 407, at 419, 9 L.Ed.2d 441, at 457, compels this result. But even if the interrogation techniques did not induce an involuntary confession, the confession and its fruits would nonetheless have to be excluded because of the taint of the illegal investigatory arrest and denial of defendant's right to counsel.

We are, of course, required to look at the totality of circumstances in considering the admissibility of a confession. A confession, even if voluntary, does not ipso facto assure its use as evidence at trial. Thus, assuming that the evidence established a voluntary confession, the State would still have to establish first, that the illegal investigatory arrest did not contribute to the ultimate confession induced. Second, and assuming that the State crossed the first barrier, the State would have to establish that the denial of counsel did not contribute to the ultimate confession induced. Without successfully crossing these evidentiary barriers, the confession and its fruits cannot be used against the defendant at trial.

We look first at the illegal investigatory arrest. On the other hand, we look at the State's token compliance with _Miranda_ just before he confessed on late Sunday morning. The State would have us ignore the failures to comply with _Miranda_ or _Escobedo_ during the in-custody proceedings, and simply concentrate on the _Miranda_ warnings and waiver obtained immediately before the confession. But we cannot isolate the _Miranda_ warnings and thus legitimize what went on before. In Brown v. Illinois (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, the United States Supreme Court stated that compliance at some point in the procedure with the _Miranda_ warnings does not _ipso facto_ remove the taint of an illegal investigatory arrest. Although it is an important factor, compliance with _Miranda_ after the arrest, is only one of several factors to be considered.

In _Brown,_ the Court emphasized that the Fifth Amendment and the Fourth Amendment serve different purposes in relation to law enforcement. The Fifth Amendment serves to correct abuses, and therefore, a showing that a confession is voluntary will suffice to allow its admission into evidence. On the other hand, the Fourth Amendment seeks to prevent abuses and it requires that a confession, even though it is shown to be voluntary, must also be sufficiently removed from the illegal arrest so as to remove the taint of the arrest. If it is so removed the confession is admissible; if it is not, the confession is not admissible. _Brown,_ 422 U.S. at 602, 95 S.Ct. at 2261, 45 L.Ed.2d 426. In the context of an illegal investigatory arrest the Court discussed the importance of the _Miranda_ warnings in relation to the other circumstances which occur after the arrest:

> "The Miranda warnings are an important factor,
> to be sure, in determining whether the confession
> is obtained by exploitation of an illegal arrest.

-55-

But they are not the only factor to be
considered. The temporal proximity of the
arrest and the confession, the presence of
intervening circumstances, see Johnson v.
Louisiana, 406 U.S. 356 (1972), and, _particularly_
_the_ _purpose_ _and_ _flagrancy_ _of_ _the_ _official_ _mis-_
_conduct_ _are_ _all_ _relevant_." See Wong Sun v.
United States, 471 U.S. at 491." Brown v.
Illinois, 422 U.S. at 603-604, 95 S.Ct. 2261-
2262, 45 L.Ed.2d at 427. (Emphasis added.)

But just as a compliance with _Miranda_ at some point
in the proceedings does not assure the admissibility of a
confession, nor does a constitutional violation _ipso_ _facto_
compel the exclusion of a confession and its fruits. If
the State can prove that the confession obtained is sufficiently
removed from the initial constitutional violation (here, the
illegal investigatory arrest) so that it is not tainted by
this violation, the confession is admissible. _Wong_ _Sun_,
supra, 371 U.S. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.
Thus the State's burden in this case is to prove that the
confession on late Sunday morning, is by circumstances inter-
vening between the confession and the initial investigatory
arrest, sufficiently removed from the constitutional violation
so that it is no longer tainted. That burden is insurmountable.

The confession is inextricably connected to the illegal
investigatory arrest, for it is the arrest which secured the
necessary condition of custody and isolation by which the
agents of the State could commence its four day holiday with
defendant's constitutional rights. Rather than the four
day time lag being a period of conscientious observance of
defendant's constitutional rights, it was a period of
unscrupulous violation of defendant's constitutional rights.
He was not only denied his right to counsel, the interrogation
techniques found so offensive in the main opinion, were the
essential tools by which the confession was induced. There
was no intervening circumstance which did not relate back to
and was not the product of the illegal investigatory arrest.

-56-

Indeed, it is this kind of police misconduct which was expressly condemned in Brown (422 U.S. at 605, 95 S.Ct. at 2262, 42 L.Ed.2d at 428). Here, the confession was not merely tainted by the illegal investigatory arrest, it was totally and irrevocably poisoned by those events intervening between the arrest and the confession.

For the foregoing reasons I would reverse the conviction, order the confession and its fruits suppressed, and, because absent this evidence there is insufficient evidence upon which the prosecution could survive a motion for directed verdict based on insufficiency of the evidence, I would order the case dismissed. To sustain the conviction in this case it would not only require this Court to bury its head in the sand, it would require us to bury our entire judicial body so that not even the soles of our feet would appear above the mud within which the defendant's constitutional rights were buried by the State.

Daniel J. Slea
Justice