No. 79-67

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

EDMOND WILSON DAVISON,

Defendant and Appellant.

Appeal from: District Court of the Eleventh Judicial District, In and for the County of Flathead. Honorable James M. Salansky, Judge presiding.

Counsel of Record:

For Appellant:

Daley, Sherlock and Nardi, Kalispell, Montana Patrick Sherlock argued, Kalispell, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana Richard Larson argued, Assistant Attorney General, Helena, Montana Ted O. Lympus, County Attorney, Kalispell, Montana

Submitted: April 14, 1980

Decided: JUL 9 1980

Filed: JUL 9 1980

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant, Edmond Wilson Davison, was charged with the offenses of aggravated burglary and sexual intercourse without consent in the District Court of Flathead County. A verdict of guilty of each offense was returned by the jury. Defendant was sentenced to 15 years on each count plus an additional five years for use of a knife to be served consecutively for a total of 35 years. From the conviction and sentence, defendant appeals.

During the early morning hours of March 2, 1979, two men forced their way into a mobile home located near the city limits of Kalispell, Montana. Christine Decker and her three year old daughter were asleep in separate bedrooms of the mobile home at that time. Christine was awakened as the two men entered her bedroom. The room was dark and her head was immediately covered so that she could not see. She testified that a sharp instrument was held against her back and side, but no wounds were inflicted. She was then raped by her attacker and then by the accomplice. Her head was covered during the entire attack. After the attack the men asked her where she kept her money. She was then told to keep quiet and forced to lie under her bed as the two men retreated from the home. The daughter slept through the attack.

After the two men left Ms. Decker summoned the Kalispell City Police and law enforcement personnel arrived shortly there-after. The victim was taken to a Kalispell hospital. The examining physician found evidence of recent sexual intercourse, but no prominent physical wounds.

Ms. Decker was never able to identify her attackers. She testified that she locked the doors before retiring the night of March 2, 1979. Sheriff's deputies found evidence of forced entry into Ms. Decker's home and evidence that her purse had been rifled, but no positive evidence indicating who had been involved.

Law enforcement investigation ultimately led officers to Victor Gardner. Gardner confessed to the crimes and implicated defendant. On March 5, 1979, the defendant and his wife were arrested in Kalispell on an outstanding warrant that related to a bad check charge. Defendant was taken to the county jail for questioning.

Defendant was interrogated by deputies Christian and Lamb. The questioning concerned defendant's involvement in the above-described rape. Before being questioned, the defendant was given a "Miranda" warning. During the interrogation, which lasted two to three hours, defendant denied any involvement with the rape or the burglary. At one point during the questioning, defendant was told that if he attempted to leave, he would be knocked back in his chair. During the interrogation, Christian removed his jacket and briefly placed it over the defendant's head for the stated reason of demonstrating to defendant how the victim had been assaulted. Defendant stated that Christian banged defendant's head into the wall during this demonstration. Christian denied this. Later, during the questioning, Christian removed his service revolver from its holster, unloaded it in front of the defendant, and returned the revolver to its holster. According to Christian this was done to protect defendant, himself and Deputy Lamb, because Christian was concerned that defendant might attempt to take the revolver. Defendant testified that Christian threatened to strike him with the empty revolver. Christian denied making this, or any other threat.

According to Christian's testimony at the suppression hearing, the defendant had been in a highly emotional state during the interrogation and the interrogation room was very warm. Defendant would not make a statement to Christian or Lamb. Defendant testified that he was told during the interrogation that if he did not cooperate with the officers they would do their best to get a

- 3 -

60-year sentence for defendant. Christian testified that he did not remember mentioning a possible 60-year sentence to the defendant, but Christian did remember that he did not make any threats.

Near the end of the interrogation, a tape recording of the confession of the codefendant, Victor Gardner, was played to defendant. At the conclusion of the interview, the defendant was led from the interrogation room. Defendant testified that Christian and Lamb had been "mad" at him and generally belligerent during the interrogation.

Before being taken to his cell, the defendant was confronted by Officer Hawk, and defendant asked Hawk if Gardner had in fact confessed. Hawk assured the defendant that Gardner had. Hawk suggested to the defendant that if he had a problem with Lamb and Christian that he (defendant) might prefer talking with Hawk. Defendant agreed to talk with Hawk, and at this time the defendant made a tape-recorded confession. The defendant was again given his "Miranda" rights prior to the confession.

Defendant's confession matched Gardner's version and the victim's version of the crime. Gardner testified that the two men had broken into the mobile home armed with a knife, had raped the victim and rifled her purse. At the trial the defendant stated that he did not break into the victim's home and that he had given his confession after hearing Gardner's because he was afraid that "they were going to send me to prison for 60 years."

The jury found defendant guilty as charged and the trial court judge sentenced him to 35 years at the Montana State Prison. Victor Gardner, the codefendant, was sentenced to a total of 8 years under a plea bargain arrangement.

Defendant advances three specifications of error:

1. Error in ruling that defendant's confession was admissible.

2. Whether defendant's right to trial was adversely

affected by the imposition of a lesser sentence upon his co-defendant?

3. Whether the enhancement of defendant's sentence pursuant to section 46-18-221, MCA, constitutes a violation of due process or the proscription against double jeopardy?

Defendant contends that his confession was involuntary, and, as a consequence, inadmissible at his trial. Both the United States Supreme Court and this Court have considered the issue of involuntary confessions in a large number of cases. These cases make it clear that an involuntary confession may not be used against a defendant in a criminal trial. This rule is true whether the defendant was physically or mentally coerced into making the confession. Leyra v. Denno (1954), 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed 948.

An extensive rationale for this rule is presented in State v. Allies (1979), ____Mont.____, 606 P.2d 1043 at 1048-49, 36 St. Rep. 2352 at 2358-59. The purpose for excluding such evidence is partially because a coerced confession may be untrustworthy, but more importantly, such confessions violate the guarantee against self-incrimination as well as the right to due process of law. As the United States Supreme Court said: "The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principals." Lego v. Twomey (1972), 404 U.S. 477, 485, 92 S.Ct. 619, 624, 30 L Ed 2d 618, 625. The courts will not condone the action taken by law enforcement authorities in securing a coerced confession. Spano v. New York (1959), 360 U.S. 315, 79 S.Ct. 1202, 3 L Ed 2d 1265. In reviewing the voluntariness of confessions the emphasis is on whether the statement is a product of free choice or compulsion. This emphasis protects the individual's right not to incriminate himself. Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L Ed 2d 694.

In Schneckloth v. Bustamonte (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L Ed 2d 854, the Supreme Court said:

"Rather, 'voluntariness' has reflected an accomodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. See Culombe v. Connecticut, supra, at 578-580. Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Haynes v. Washington, 373 U.S. 503, 515. At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. '[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.' Blackburn v. Alabama, 361 U.S. 199, 206-207. See also Culombe v. Connecticut, supra, at 581-584; Chambers v. Florida, 309 U.S. 227, 235-238." 412 U.S. at 224-225.

The United States Supreme Court has said that the test to be applied in determining whether a particular confession is voluntary or involuntary, is as follows:

"Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will had been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." Culombe v. Connecticut (1961), 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L Ed 2d 1037.

If the defendant should contend that his confession was the product of coercion, then the burden is placed on the State to show that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. The State must prove voluntariness by a preponderance of the evidence. State v. Smith (1974), 164 Mont. 334, 338, 523 P.2d 1395, 1397.

The issue of voluntariness and admissibility is addressed in the first instance to the trial court's discretion and depends

- 6 -

upon the totality of the circumstances. Jackson v. Denno (1964), 378 U.S. 368, 84 S.Ct. 1774, 12 L Ed 2d 908; State v. Lenon (1977), 174 Mont. 264, 570 P.2d 901; State v. White (1965), 146 Mont. 226, 405 P.2d 761. If there is substantial credible evidence to support the trial court's finding, it must be affirmed. State v. Grimestad (1979), ____Mont.____, 598 P.2d 198, 36 St.Rep. 1245, 1251.

In the present case the defendant points to several instances of police conduct which allegedly rendered the confession a product of coercion. The first of these is Christian's action of briefly placing a coat over defendant's head. According to the testimony, the coat was only left on the defendant's head for a few seconds and then removed. Christian testified that this action was taken to demonstrate to the defendant an aspect of the rape that had been committed. Christian also unloaded his service revolver while the defendant was being questioned. The explanation given for this action was ". . . that I thought it was best for my safety and his [defendant's]." Despite defendant's testimony to the contrary, Christian denied threatening to strike defendant with the revolver.

Defendant also contends that he was threatened with a sentence of 60 years if he did not cooperate. Christian testified at the suppression hearing that he could not remember whether a 60-year sentence was mentioned. He did state that no promises were made to defendant. Deputy Hawk, who was just outside the room where the questioning took place and overheard portions of the interrogation, also testified that no threats or promises were made regarding a possible sentence in exchange for cooperation. Hawk and Christian did testify that "self-help" was discussed with the defendant. Hawk testified as follows:

> "A. Well, it is on his conscience, if he wants to get it cleared up, if he needs some help with alcohol, if he needs some help with drugs, if he has a drug problem. These are things that he can only do for

himself. But the place to start is to get this taken care of and get it out of the way so he can start fresh. He is not going to be able to help himself very well with this hanging over him. And so the emphasis is on self-help. 'Maybe we can get you some.' And then there is the thing as far as there were no threats made or promises made, 'However, if you help us then it will go in the reports that you were cooperative, and if there is a question of "was this individual cooperating with the police, was he trying to help himself," the answer would have to be yes.' He was in my case. He was not in the other two detectives' case. And I think they told him that.

"Q. That would be all the help you would give him was indicate whether he was cooperative or not? A. That is correct. If there is a question of attitude or that sort of thing, we can indicate that. There was no other promises or threats made, to my knowledge."

Defendant also contends that the police used a "good cop-bad cop" technique during questioning, and that this technique is another indication of coercion. The defendant testified at the suppression hearing that Lamb and Christian appeared to be angry with the defendant when they could not get a confession, while Hawk "was real nice." Hawk and Christian denied that the use of the "good cop-bad cop" technique was prearranged.

It must be noted that the defendant was advised of his "Miranda" rights on four occasions before he gave his confession. He was advised of his rights at his arrest, again when deputies Lamb and Christian began questioning him, again before his confession was taken, and again as his confession was being recorded. According to the testimony at the suppression hearing, the defendant never asked for an attorney and he never asserted his right to remain silent. At the time the confession was given the defendant was 20 years old, had a tenth grade education, had received a G.E.D. and had previous service with the United States Marine Corps.

The trial judge concluded that there was no coercion, physical brutality, or intimidation involved in securing the confession. He also concluded that, under the totality of the circumstances,

the confession was voluntarily given.

The State has emphasized the fact that Lamb and Christian did not intend for their actions to be coercive. Also, Hawk and Christian deny that the "good cop-bad cop" technique was intentionally used.

The intention of the law enforcement officers is irrelevant to our inquiry. We are only concerned with whether the confession was coerced under the totality of the circumstances. In Miranda, supra, the United States Supreme Court acknowledged that certain techniques used by police questioners, such as the "good cop-bad cop", can take ". . . a heavy toll on liberty and trade on the weakness of individuals." 384 U.S. at 455. On the other hand, this technique, by itself, does not render a confession involuntary. State v. Allies, ____Mont.____, 606 P.2d at 1050, 36 St.Rep. at 2361. In the present case, the interrogation was not overly long. The trial court found that the interrogation lasted approximately three hours. The "nice cop" did not play on the defendant's sympathies or subject him to long, continuous questioning such as occurred in Spano v. New York, supra.

The timing of the defendant's confession is particularly pertinent to this inquiry. At the end of the questioning by Christian and Lamb the confession of Victor Gardner was played for the defendant. Shortly thereafter, the defendant asked Hawk whether Gardner had indeed confessed. When Hawk assured the defendant that Gardner had confessed the defendant gave his own confession. In other words, it appears that the knowledge of Gardner's confession triggered the defendant's confession. In addition, the defendant was twice given his "Miranda" warning by Hawk shortly before the confession was made. This chain of events would severely blunt or nullify the charge that the confession was the product of coercive tactics employed prior to the playing of Gardner's confession.

The defendant also alleges the coercive effect of the threat that he could receive up to sixty years in prison if he failed to cooperate. The District Court found that the defendant was advised of the maximum penalty and that it could be imposed if he did not cooperate. This finding is supported by substantial, credible evidence and must be accepted as true. In Territory v. Underwood (1888), 8 Mont. 131, 135, 19 P. 398, 400, this Court reversed a conviction where a confession was obtained by a promise of favor and influence. In Underwood, however, it is apparent that the confession was directly prompted by promises that the charges would be dropped or the punishment reduced. The contrary appears in the present case. At the suppression hearing the defendant was questioned by the Court concerning the "Miranda" warnings, as follows:

"Q. You understood what they meant, didn't you?
A. Yes sir.

"Q. But you chose not to ask for a lawyer? A. No sir.

"Q. You chose not to remain silent either? A. Yes sir.

"Q. You decided to spill it, right? A. I decided to cooperate with them, yes sir.

"Q. What made you decide finally to cooperate? A. After thinking it all over, sir, after what they told me and after what Deputy Hawk told me and after listening to what Vic said, I just thought I better--They said they already had me guilty."

Given all of the factors: the defendant's age and education, the length of the interrogation, the number of times the "Miranda" warning was given, the defendant's acknowledgment that he understood these warnings, and most important, the triggering effect of Gardner's confession, it cannot be said that the trial court abused its discretion in finding the confession voluntary. We hold that the totality of the circumstances supports the District Court's finding that the confession was freely given. As a consequence,

it was not error for the confession to be allowed into evidence.

The defendant next contends that his 35-year sentence, in contrast to Victor Gardner's sentence of eight years under a plea bargain agreement, constitutes a deprivation of defendant's right to trial under Art. II, §26, 1972 Montana Constitution, and the Sixth Amendment of the United States Constitution. Victor Gardner confessed to the charges of aggravated burglary and sexual intercourse without consent. Pursuant to a plea bargain Gardner pleaded guilty to the rape charge and received an eight-year sentence. After trial and a jury verdict of guilty, the defendant received a 35-year sentence.

According to the defendant the disparity in the sentences indicates that he is being punished for insisting upon a trial. Defendant states in his brief: ". . . the Defendant and all future criminal defendants will be put on notice that the penalty for the exercise of the fundamental right to a trial by jury is harsh."

The defendant received less than the maximum 70-year sentence that could have been imposed as a result of being convicted of sexual intercourse without consent (20 years) and aggravated burglary (40 years). Sections 45-5-503(2) and 45-6-204(3), MCA. Section 46-18-221, MCA, allows a maximum, additional 10-year sentence for offenses committed with a dangerous weapon. There is no rule that a disparity of sentences given to codefendants similarly situated is improper. As was said in People v. Brubaker (Colo. 1975), 539 P.2d 1277, 1279:

> "Due to the individualized nature of sentencing, there is no rule that confederates in crime must receive equal sentences, nor that failure to impose equal sentences violates equal protection of the law . . ."

See also State v. Butler (1966), 148 Mont. 46, 417 P.2d 100.

It is defendant's contention that he was punished for going to trial. This Court has said that a sentence may not be augmented because a defendant has insisted on his privilege against self-

incrimination. Matter of Jones (1978), ____Mont.____, 578 P.2d 1150, 1154, 35 St.Rep. 469, 474. The same rationale applies to the constitutional right to a trial. The correct analysis of this problem is stated in United States v. Peskin (7th Cir. 1975), 527 F.2d 71, at 87:

> "A sentence which reflects punishment for a defendant's availing himself of his right to trial will be set aside, United States v. Wiley, 278 F.2d 500 (7th Cir. 1960), but a disparity between a sentence imposed on a defendant who pleads guilty and on another who is convicted after trial is not, standing alone, enough to establish that the latter has been punished for exercising a constitutional right. United States v. Wilson, 506 F.2d 1252, 1259-60 (7th Cir. 1974).
>
> "The trial judge commented at the time of sentencing on factors which he felt spelled out greater culpability for Mr. Peskin than his codefendants. We have no reason to find an abuse of discretion."

In other words, it is not to be presumed that a disparity in sentences imposed indicates increased punishment for exercising the right to a trial. A defendant must show abuse of discretion. In the present case, the sentencing court enumerated several factors upon which it based the sentence. These factors include the nature of the crime committed, the fact that defendant's past behavior had been characterized by violent episodes, and the fact that society needed to be protected from the defendant. This Court has said that a sentence within the maximum authorized by statute is generally not cruel and unusual punishment. State v. Karathanos (1972), 158 Mont. 461, 468, 493 P.2d 326. This Court has also said that the extent of punishment is vested in the sound discretion of the trial court. Petition of Amor (1963), 143 Mont. 305, 389 P.2d 54. We note that the equitability of a sentence, as opposed to its legality, is a matter for the Sentence Review Board. State v. Metz (1979), ____Mont.____, 604 P.2d 102, 36 St.Rep. 2261, 2264.

In the present case, the sentence was well within the statutory maximum. The judge outlined his reasons for the sentence

and these reasons do not include the defendant's decision to go to trial. The reasons given support the severity of the sentence given. There was no showing of abuse of discretion. Consequently, the defendant was not denied his right to a trial.

Pursuant to section 46-18-221, MCA, the defendant was sentenced to five additional years for the commission of rape with a dangerous weapon. Because this statutory section was not recited in the charging document, defendant claims that he was sentenced for a crime with which he was not charged.

The Sixth Amendment of the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." It is well accepted that a defendant must be fairly apprised of the crime he is being charged with and given a chance to be heard. Cole v. Arkansas (1948), 333 U.S. 196, 201, 68 S.Ct. 514, 92 L Ed 644; State v. Holt (1948), 121 Mont. 459, 194 P.2d 651. As a consequence, the charging document must charge the crime with certainty and precision. State v. Hem (1923), 69 Mont. 57, 60, 220 P. 80. Section 46-11-401, MCA, is a statutory implementation of these general principals and this statute outlines the necessary elements to be included in a charging document.

Section 46-18-221, MCA, imposes an additional mandatory sentence upon a defendant found guilty of an offense while knowingly using a dangerous weapon. (In this case, the defendant used a knife.) The language of the statute clearly indicates that it is only intended to provide for an enhanced penalty once the defendant has been found guilty of an underlying offense. In addition, this statute is found in the chapter of the Criminal Procedure Code which deals with the sentencing of criminal defendants. We hold that the statute does not provide for a separate, substantive offense. For cases from other jurisdictions which have construed

similar statutes as being sentencing rather than criminal statutes see: State v. Petrich (1978), 21 Wash.App. 100, 583 P.2d 674; Brown v. District Court (Colo. 1977), 569 P.2d 1390, 1391; and In re Culbreth (1976), 130 Cal.Rptr. 719, 551 P.2d 23, 25. The instant case does not present a situation where it is uncertain whether the legislature intended to create distinct offenses such as in Whitton v. State (Alaska 1970), 479 P.2d 302, 305. Section 46-18-221, MCA, only applies once a defendant has been found guilty of the underlying offense.

The Utah Supreme Court addressed a similar problem in State v. Angus (Utah 1978), 581 P.2d 992. The Utah Court said:

> "We have no disagreement with the proposition that fairness and due process of law require that the information against him be sufficient to clearly state the charge and bring him within the operation of the statutory penalty therefor. But his argument that the information must specifically set forth that the enhancement of penalty would be imposed if he was convicted is without merit. The punishment for a crime is not and has never been considered a part of the pleading charging a crime. The information is sufficient if it alleges either: (1) that the defendant is being charged under the enhancement statute, or (2) that a firearm was used in the commission of the offense charged in the information. The trial by the jury is to determine the guilt or innocence of the defendant. After conviction, the penalty to be imposed is an entirely separate proposition to be determined by the court as a matter of law on the basis of the penalty prescribed by the statutes." 581 P.2d at 995.

In Angus the information specifically alleged that the offense was committed by use of a firearm and the Court found no denial of due process.

In the present case the charging document mentions that the defendant was armed with a knife while committing the crimes with which he was charged. The jury found the defendant guilty of aggravated burglary, which is defined, in part, as committing burglary while being armed with a weapon. Section 45-6-204(2)(a), MCA. The jury was instructed as to this statute. As a result, the defendant was not denied due process for lack of notice or lack of hearing.

- 14 -

The defendant next contends that the additional five years imposed pursuant to section 46-18-221, MCA, subjected him to multiple punishments in violation of the double jeopardy clauses of the federal and state constitutions. In North Carolina v. Pearce (1969), 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L Ed 2d 656, the Supreme Court said that the double jeopardy clause " . . . Protects against multiple punishments for the same offense." It must be noted, however, that Pearce was concerned with whether the proscription against double jeopardy was violated when punishment already exacted for an offense was not fully credited in imposing sentence upon a new conviction for the same offense. Pearce did not deal with whether double jeopardy applies when an enhancing statute is used to increase the punishment for an underlying offense. In Simpson v. United States (1978), 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed/70, 2d the Supreme Court was presented with this constitutional issue, but the case was decided on other grounds. The Supreme Court looked to legislative intent and found that Congress did not intend for the enhancement statute to be used in sentencing defendants convicted of certain crimes. 435 U.S. at 12-13. We find that there is no such intent expressed by section 46-18-221, MCA, which applies to "any offense."

In State v. Foster (1979), 91 Wash.2d 466, 589 P.2d 789, the Court considered a double jeopardy claim under a similar enhancement statute and said:

> " . . . appellant contends that application of the
> firearm enhancement statute is violative of his
> rights under the double jeopardy clause of the fifth
> amendment to the United States Constitution. To
> support this contention, appellant cites North Carolina
> v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076,
> 23 L.Ed.2d 656 (1969), in which the United States
> Supreme Court stated that the Fifth Amendment 'protects
> against multiple punishments for the same offense.'
> Neither Pearce nor the cases cited within it to support
> this cited proposition are apposite to the challenged
> statutory scheme which provides for enhanced penalty
> based on the existence of an additional factor--the
> use of a firearm. In a recent case which presented
> a double jeopardy challenge to a federal statute imposing

an additional penalty for the use of a firearm
while committing a felony, the United States Supreme
Court expressly declined to reach the constitutional
issue. See Simpson v. United States, 435 U.S. 6, 98
S.Ct. 909, 55 L.Ed.2d 70 (1978). We are aware of
no authority which supports appellant's claim of
double jeopardy for this type of enhanced penalty
scheme." 589 P.2d at 797.

We apply the same reasoning to the present case. The statute involved is merely an enhancing statute. It does not create or penalize the defendant for a separate offense.

The defendant places a great deal of reliance on Whitton v. State, supra. In Whitton the Alaska court felt that the legislature may have intended for the enhancement statute to be a separate distinct offense. They went on to hold ". . . that Alaska's constitutional prohibition against double jeopardy prevents one from receiving multiple prison sentences for the same offense." 479 P.2d at 310.

This Court need not reach the question posed in Whitton, i.e. may a state impose multiple prison sentences for the same offense. In Whitton, the court first decided that the enhancement statute might have been intended as a distinct, separate offense, with an attendant punishment. In the present case, the enhancement statute does not define a separate, distinct offense. Consequently, there is not, under section 46-18-221, MCA, the imposition of a multiple prison sentence arising from a single criminal offense. Rather, this statute mandates an increased prison sentence for a single, specific crime if a dangerous weapon is used by the defendant. Therefore, no double jeopardy violation is involved.

Affirmed.

_____
Chief Justice

- 16 -

We concur:

_____
Gene B. Daly

_____
John Conway Harrison

_____

_____
John C. Sheehy

Justices

Mr. Justice Daniel J. Shea will file a concurring opinion at a later date.