FILED

02/28/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0445

DA 14-0445

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 36

STATE OF MONTANA,

   Plaintiff and Appellee,

 v.

JASMINE NICOLE ESKEW,

   Defendant and Appellant.

APPEAL FROM:  District Court of the Eighth Judicial District,
       In and For the County of Cascade, Cause No. DDC-12-425
       Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

       Chad Wright, Chief Appellate Defender, Koan Mercer (argued), Assistant
       Appellate Defender, Helena, Montana

    For Appellee:

       Timothy C. Fox, Montana Attorney General, Mardell Ployhar (argued),
       Assistant Attorney General, Helena, Montana

       John W. Parker, Cascade County Attorney, Susan L. Weber, Deputy
       County Attorney, Great Falls, Montana

    For Amici The Innocence Project, Inc. and the Montana Innocence Project:

       Paul M. Leisher, Paoli Law Firm, P.C., Missoula, Montana

       Larry D. Mansch, Toby Cook, Montana Innocence Project,
       Missoula, Montana

       Argued and Submitted: December 7, 2016

              Decided: February 28, 2017

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Jasmine Nicole Eskew appeals from her conviction of felony Assault on a Minor in violation of § 45-5-212, MCA.  We reverse the conviction.

¶2     We restate the issue on appeal as follows:

*Did the District Court properly admit evidence of Eskew's admissions or confession made during police interrogation?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On September 18, 2012, Eskew called 911 in Great Falls to report that her six-month-old daughter Brooklyn was unresponsive and not breathing.  Paramedics arrived and found Brooklyn as her mother described, and took her to the hospital.  As the paramedics arrived, Eskew's recent boyfriend Greg Robey was seen leaving the residence.  Brooklyn had a severe head injury with subdural bleeding on her left side.  While a CT scan showed that her skull was fractured, medical personnel did not identify that fact until later.  Medical personnel suspected child abuse and contacted law enforcement, telling responding officers that Brooklyn's injury resulted from shaking.

¶4     Shortly after Eskew arrived at the hospital in Great Falls, law enforcement officers talked to her about Brooklyn's condition.[1] They took her to the police station, away from the hospital and from Brooklyn.  They placed her alone in an interrogation room where she was upset and sobbing repeatedly that "I want my baby."

¶5     After a considerable period of time, two Great Falls Police officers entered the interrogation room.  They read Eskew a *Miranda* advisory and then gave her a printed

---

[1] These facts are taken from the transcript of the police interrogation of Eskew.

copy.  Eskew read and signed the *Miranda* advisory.  The two officers assured Eskew that her daughter was being cared for and that as soon as they finished talking to her she would be reunited.  They told her that they needed an accurate description of what had happened so that it could be passed on to the doctors.  They told her that Brooklyn could not be adequately treated unless she answered their questions and that the sooner they finished the interview the sooner they could get her back to her daughter.  "We'll get this over with and get you back up to your daughter, okay?" Officers told Eskew that she was the only one who could help Brooklyn, and that Eskew was "hurting" her daughter by not giving them the responses they expected about the injury to the baby.

¶6     Eskew often responded to repeated questions with only a few words, and many of her responses were transcribed as "inaudible."  Eskew told the officers how she found her daughter in distress and had tried to console her by rocking her.  Eskew denied the officers' allegations that she shook Brooklyn, stating that she "didn't shake her or anything."  The officers told Eskew that they already knew what had happened and demanded that Eskew admit that her description of "rocking" Brooklyn to console her was actually "shaking."  Eskew repeatedly denied shaking Brooklyn.

¶7     The officers gave Eskew a doll to demonstrate how she rocked her daughter.  Eskew did so, but the officers insisted that she do it differently and that she "make the doll's head rock!"  The interrogation went on for about four hours.  Ultimately Eskew relented and shook the doll for the officers and told them that she had shaken her daughter.

¶8      Brooklyn and her mother were never reunited. Brooklyn was transferred to Spokane for treatment while Eskew was under interrogation. When Brooklyn arrived in Spokane, medical personnel detected her skull fracture on the CT scan, and she showed other signs of non-accidental injury. She died several days later while Eskew was in jail. A subsequent autopsy revealed that Brooklyn had died from brain injuries caused by a single blow to the head, and that there was no evidence that she had any injury that resulted from having been shaken.

¶9      The State charged Eskew with deliberate homicide in the death of her daughter. Prior to trial Eskew moved to suppress the results of the interrogation, contending that her admissions were not voluntary. On December 2, 2013, the District Court held the hearing on the motion to suppress. The two Great Falls Police officers who conducted the interrogation testified, along with two experts proffered by the defense. The District Court heard that testimony and watched the video of the interrogation.

¶10     District Court found that the police officers deliberately lied to Eskew by telling her that the interview was necessary to get information to treat Brooklyn, by telling her that her responses to their questions could determine whether her daughter received the proper medical treatment, and by telling her that she would be reunited with her daughter as soon as the interrogation was over. The District Court found that the real purpose of the interview was to obtain admissions from Eskew that fit the officers' pre-determination that she had caused her daughter's injury by shaking her. The District Court found that Eskew did not understand that the officers were questioning her in order to charge her with a serious crime. The District Court denied the motion to suppress.

5

¶11 At trial the State relied heavily upon the admissions that Eskew made during the interrogation. The jury found Eskew not guilty of deliberate homicide, but guilty of felony assault on a minor pursuant to § 45-5-212, MCA. Eskew spent almost two years in jail by the time of sentencing. The District Court imposed a five-year term to the Montana Department of Corrections. Eskew appeals her conviction.

## STANDARD OF REVIEW

¶12 This Court reviews a district court's decision on a motion to suppress to determine whether the findings of fact meet the clearly erroneous standard, and whether the findings are correctly applied as a matter of law. A finding of fact is clearly erroneous if it is not supported by substantial evidence; if the district court misapprehended the effect of the evidence, or if this Court is definitely and firmly convinced that the district court made a mistake. Whether a confession is voluntary is a factual issue and the district court is in the best position to determine the credibility of witnesses who testify. This Court will not re-weigh evidence considered by the district court or substitute our own evaluation of that evidence. *State v. Old-Horn*, 2014 MT 161, ¶¶ 13-14, 375 Mont. 310, 328 P.3d 638.

## DISCUSSION

¶13 *Issue: Did the District Court properly admit evidence of Eskew's admissions or confession made during police interrogation?*

¶14 The law regarding confessions in criminal proceedings is well established in Montana. Voluntary confessions are generally admissible in criminal prosecutions, and they are recognized as an important tool for law enforcement. *State v. Allies*, 186 Mont. 99, 109, 606 P.2d 1043, 1048 (1979). A voluntary confession is the result of a free

choice by the suspect, and "if he has willed to confess, it may be used against him." *State v. Davison*, 188 Mont. 432, 438, 614 P.2d 489, 493 (1980) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 1879 (1961)). However, a person charged with a crime has a right under the due process clause of the Fourteenth Amendment coupled with the Fifth Amendment right against self-incrimination to not be convicted based upon an involuntary confession. *Dickerson v. U.S.*, 530 U.S. 428, 434-35, 120 S. Ct. 2326, 2330 (2000); *State v. Morrisey*, 2009 MT 201, ¶ 29, 351 Mont. 144, 214 P.3d 708. An involuntary confession is not admissible against the defendant, and if the defendant moves to suppress a confession, the burden shifts to the State to "prove by a preponderance of the evidence that the confession or admission was voluntary." Section 46-13-301(2), MCA; *Davison*, 188 Mont. at 438, 614 P.2d at 493.

¶15 For over 125 years this Court has recognized that an involuntary confession may not be used in a criminal prosecution. In *Territory of Montana v. Underwood*, 8 Mont. 131, 19 P. 398 (1888), this Court held that "[i]t is elementary law that before a confession can be received in evidence in a criminal case it must appear that it was voluntary . . . ." The confession in that case was suppressed because it was induced by promises of more lenient treatment. *Underwood*, 8 Mont. at 134, 19 P. at 400. Use of an involuntary confession "vitiates a criminal conviction" because it violates the defendant's constitutional rights to due process and to be free from self-incrimination. *Allies*, 186 Mont. at 110, 606 P.2d at 1049. An involuntary confession may not be used, even if it is truthful. *Allies*, 186 Mont. at 110, 606 P.2d at 1049.

7

¶16 Determining whether a confession is voluntary is a factual issue that depends upon a consideration of the totality of the circumstances. *State v. Hermes*, 273 Mont. 446, 448, 904 P.2d 587, 588 (1995).

> When determining the voluntariness of a confession, the district court must take into account the totality of the circumstances, including the interrogation techniques used by police; the defendant's age and level of education; the defendant's prior experience with the criminal justice system; the defendant's demeanor, coherence, articulation, and capacity to make use of his or her faculties; and whether the defendant was advised of his or her *Miranda* rights. A confession induced by any threat of violence, improper influence, or by any direct or implied promise, however slight, may be involuntary.

*Old-Horn*, ¶ 17 (internal citations omitted).

¶17 This Court has considered numerous factors in individual cases that can bear upon whether a confession is voluntary, and no single factor controls. *State v. Grey*, 274 Mont. 206, 210, 907 P.2d 951, 954 (1995). Relevant factors have included the defendant's age, education, background and experience with law enforcement. *State v. Craig*, 262 Mont. 240, 242, 864 P.2d 1240, 1242 (1993). The use of psychological pressure on the defendant in a coercive setting, including coercive questioning that minimizes the defendant's ability to deny wrongdoing, along with failure to deliver adequate *Miranda* warnings are relevant considerations, *Hermes*, 273 Mont. at 448, 904 P.2d at 588. Advising a suspect of her *Miranda* rights, even if done properly, "is not a license to coerce a confession." *Allies*, 186 Mont. at 115, 606 P.2d at 1051.

¶18 Other relevant factors in evaluating the voluntariness of a confession are the use of psychological coercion; isolating the suspect in a small room; using a mean cop-nice cop interrogation technique; interrogation under the assumption of guilt; and lying to the

8

suspect about what is known of her involvement in the crime. *Allies*, 186 Mont. at 112-14, 606 P.2d at 1050-51. A confession may not be induced by threats or violence, promises, or lies and deception by the interrogator. *Grey*, 274 Mont. at 211, 907 P.2d at 954. Lying to the suspect about what law enforcement knows about her involvement in the crime is "particularly repulsive to and totally incompatible with the concept of due process." *Allies*, 186 Mont. at 113, 606 P.2d at 1051. We recently emphasized that "[w]e will not condone the use of deception to obtain a confession." *Old-Horn*, ¶ 25.

¶19 An involuntary confession cannot be used against a defendant at trial. *Davison*, 188 Mont. at 437, 614 P.2d at 492. Use of an involuntary confession to obtain a conviction is trial error, and even if there was other evidence to support the result the State must demonstrate that there is no reasonable possibility that the confession contributed to the conviction. *State v. Spang*, 2002 MT 120, ¶ 32, 310 Mont. 52, 48 P.3d 727 (conviction reversed, remanded for a new trial without the use of statements made during an involuntary confession).

¶20 Based upon the evidence at the suppression hearing, the District Court found that Eskew was age twenty-one, a single mother with a six-month-old daughter and that she still lived with her parents. She was intelligent and articulate; a high school graduate; and an employee at JCPenney. She had obtained a two-year associate degree in education from MSU Great Falls.

¶21 The District Court found that before the interrogation began at the police station, an officer told Eskew that as soon as the interrogation finished she could return to the hospital and her daughter. As noted above, the District Court subsequently found that

9

this was a misrepresentation of the true situation. For the next twenty minutes, Eskew was alone in the small windowless interview room where she "cried and sobbed" asking for her child. The District Court found that at the beginning of the interrogation an officer verbally advised Eskew of her *Miranda* rights and asked if she wanted to talk. Eskew assented verbally and physically, after which the officer gave her a written *Miranda* warning form that she "carefully and deliberately read" and "voluntarily signed." Eskew continued to sob for the next hour or more, but gradually became more composed.

¶22 The District Court found that while the tone of the officers began as "soft spoken and passive," it was later "aggressively confrontational and emphatic in challenging [Eskew's] veracity and in challenging the consistency of her statements." The District Court found that the officers did not physically threaten Eskew, and that they did not "yell" at her but occasionally "emphatically raised their voices." The District Court found:

> Throughout the first one-third of the interview, one or both of the Detectives expressly or implicitly misrepresented to Ms. Eskew that the purpose of the interview, essentially, was to find out what happened in order to facilitate medical care for the child. In reality, the sole purpose of the interview, at that juncture, under the circumstances, was to facilitate a criminal investigation of the child's injuries with Ms. Eskew as the focus of that investigation on the information available to the officers at that time.

The District Court found that except for the officers' express misrepresentation that they intended to get Eskew back to her daughter and their "numerous" misrepresentations that the focus of the interrogation was to "facilitate medical care for the child," the

interviewing techniques used were "not unduly or unfairly coercive, deceptive or manipulative under the totality of the circumstances." The District Court concluded that there was "no indication" that Eskew was not "tracking" or that she was being overwhelmed, coerced, or manipulated in the interrogation.

¶23 Based upon the totality of the circumstances, including the District Court's findings about the officers' lies to Eskew, we determine that the District Court erred by concluding that the interrogation was not unduly coercive or manipulative and by concluding that Eskew was "fully cognizant of her situation." Those conclusions are contradicted by the District Court's express finding that the officers deliberately lied to Eskew about the purpose of the interrogation (that it was to get vital information to allow doctors to treat her gravely injured daughter). Eskew could not have possibly been "fully cognizant" of her situation because the officers conducting the interrogation lied to her about material elements of her situation.

¶24 Upon review of the recording, there is every indication that Eskew underwent the interrogation believing that she was providing information to assist the doctors in treating her daughter and believing that as soon as she provided the information that the officers wanted she would be returned to the hospital. This fundamental misunderstanding of what was happening was based upon lies that precluded Eskew from understanding the situation and the significance of her answers. Further, Eskew's demonstrations of rocking and then shaking her baby, and descriptions of her interactions with her, were manipulated and orchestrated by the officers to get the result that they wanted.

11

¶25 Under the totality of the circumstances it is clear to this Court that Eskew's responses to the interrogating officers were not voluntary. We accept the District Court's findings about the interrogating officers' credibility, conduct and intent that were based upon the officers' own testimony. *State v. Gittens*, 2008 MT 55, ¶ 27, 341 Mont. 450, 178 P.3d 91 (this Court will defer to a district court's determination of the credibility of witnesses). The District Court heard the officers' live testimony describing the event and determined that they purposely lied in order to manipulate and misrepresent the situation to Eskew.

¶26 However, we disagree with the District Court's conclusion from these facts that the interview, looking at the totality of the circumstances, was not unduly deceptive or manipulative. The officers told her lies, not about peripheral points, but about the fundamental nature of the proceeding; about her part in it; and about her part in her daughter's fight for life. Her responses were manipulated by the misrepresentations of the officers about the nature of the interrogation and the importance of her responses. Her responses at important junctures—such as whether she shook her daughter—were coerced by the officers' insistence that she provide responses that they wanted because the responses were vital to the proper medical care of her daughter. This purposeful manipulation broke down Eskew's ability to resist the officers' relentless pressure to tell them what they wanted to hear—that she shook her daughter.

¶27 In summary, based upon the District Court's findings of fact, the officers deliberately misrepresented the situation to Eskew, a young mother with a dying daughter. They imposed extreme psychological pressure on her to agree with their

12

descriptions of what had happened. They told her that her refusal to admit to injuring her daughter was impeding medical treatment. They lied to her that she would be reunited with her daughter if she gave them the answers that they sought—that she shook Brooklyn and caused her injuries. When she relented and gave them what they wanted she was not reunited with her daughter, but was arrested. We conclude that upon consideration of the circumstances and the record, the State has not met its burden to show by a preponderance of the evidence that Eskew's admissions were voluntary.

¶28 Based upon our review of the record, we are firmly convinced that a mistake has been made. The District Court misapprehended the effect of the evidence and failed to apply prior established law concerning the effect of lies and psychological coercion on the issue of voluntariness of a confession. *Old-Horn*, ¶ 13. The District Court misapprehended the effect of its own findings of fact in the context of the clear law on involuntary confessions. An admissible confession cannot be the product of psychological coercion. *Hermes*, 273 Mont. at 448, 904 P.2d at 588. This Court has repeatedly held that law enforcement officers may not use lies to obtain confessions or admissions for a criminal proceeding. *Grey*, 274 Mont. at 211, 907 P.2d at 954; *Allies*, 186 Mont. at 113, 606 P.2d at 1051 (lying to a suspect to obtain a confession is "particularly repulsive to and totally incompatible with the concept of due process"); *Old-Horn*, ¶ 25 ("We will not condone the use of deception to obtain a confession."). Confessions or admissions like the ones in this case, induced by deliberate psychological coercion, lies, and material misrepresentations to the suspect are not voluntary and should be excluded from evidence. Moreover, as the District Court recognized at sentencing, the

13

use of the interrogation against Eskew was the foremost piece of evidence that led to her conviction.

¶29 We decide this appeal based upon the issue of whether Eskew's confession or admission was voluntary. Therefore, we conclude that it is not necessary to address her issue regarding the sufficiency of the *Miranda* warning or her issue regarding the defense expert.

## CONCLUSION

¶30 We conclude that the District Court erred in denying the motion to suppress and in allowing the State to use the results of the interrogation against Eskew at trial. We reverse the conviction and remand for further proceedings consistent with this Opinion.


/S/ MIKE McGRATH


We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JIM RICE


Justice Laurie McKinnon dissenting.

¶31 On September 18, 2012, Detective Noah Scott (Scott) of the Great Falls Police Department received a call from his supervisor that a six-month-old baby had arrived in critical condition at Benefis Hospital Emergency. The baby, Brooklynn, was suffering from a brain bleed, a subdural hematoma, and retinal injuries. Scott, a police officer for

14

twelve years and an Emergency Medical Technician, is employed in the Special Victims Unit and investigates crimes against children, child abuse, sexual child abuse, and some child dependency and neglect cases. When he arrived at the emergency room, Scott spoke to Nurse Practitioner Todd Koch (Koch) about Brooklynn's condition. The scene at the hospital was hectic. People were running in and out of the room in an effort to save Brooklynn, who was lying on the emergency room table with only slight movement in her legs and unable to breath on her own. Koch told Scott that Brooklynn had a subdural hematoma and retinal hemorrhaging, and that he believed Brooklynn had been shaken. Koch advised Scott that they were going to transport Brooklynn by air ambulance to Sacred Heart Medical Center in Spokane with the hope that Brooklynn's brain might still be viable and that perhaps she would survive.

¶32 Brooklynn's mother, Eskew, was in the waiting room with her mother and a female friend. Scott contacted Eskew, but did not give any information about what Koch had told him. Eskew, who stated she was the only person with Brooklynn, described how Brooklynn had been in her "saucer" and started to cry. Eskew picked up Brooklynn and started "rocking her back and forth." Scott testified that Eskew explained, without any solicitation from Scott, that "I didn't shake her or anything." Due to the inadequacy of Eskew's explanation in light of the severity of Brooklynn's injuries, Scott believed further investigation was necessary and advised Benefis medical providers that Eskew would not travel to Spokane in the transport. Indeed, the fate of Brooklynn's life lay in the hands of the medical providers, with an adequate explanation as to the mechanisms of Brooklynn's injuries being the greatest assistance Eskew could provide. Since Eskew

15

was adamant that she was the only person with Brooklyn, and her explanation of Brooklynn's injuries was clearly inadequate, Scott believed further discussion with Eskew was necessary, not only for the purpose of a potential criminal investigation, but also to assist medical providers in their treatment of Brooklynn's injuries.

¶33     Consequently, the information law enforcement had when they interviewed Eskew was that a six-month-old child's life lay in balance, with possibly fatal injuries. The mechanism for the injuries was unknown to medical providers, as a six-month-old is unable to speak for herself. Medical providers suspected the mechanism of Brooklynn's injuries was shaking. Eskew was the only person with Brooklynn at the time her injuries were inflicted. Eskew provided an inadequate explanation of the mechanism of injury, in light of the severity of Brooklynn's injuries. Finally, Eskew had announced on her own, without knowing that Brooklynn was suspected of having been shaken, that she had not shaken Brooklynn.

¶34     Following the interview, Scott learned that Brooklynn's injuries were going to be fatal. Scott and Detective Slaughter (Slaughter) hurriedly prepared to travel to Spokane to further investigate, observe, and document Brooklynn's injuries. Once in Spokane, they observed the progression of Brooklynn injuries. There was more bruising that developed on top of Brooklynn's head, in addition to other changes in her actual appearance as the injuries progressed. Eventually, the medical providers at Sacred Heart concluded Brooklynn had suffered a fracture to her skull from blunt force trauma. Significant to our characterization that detectives made numerous misrepresentations about the purpose of the interview, Dr. April Jaeger, the Pediatric Emergency Room

16

Physician who treated Brooklynn upon arrival, testified the indications from Benefis Hospital Emergency were that Brooklyn had been shaken. Further, Dr. Jaeger explained that the more information providers have about the mechanism of the injury, the better. Dr. Jaeger testified that because a baby is unable to say how the injury occurred, medical providers rely significantly on histories obtained from people around the child. Specifically, Dr. Jaeger testified that:

> having additional information from those around her as to how she might have injured her head helps us understand what medical problems may develop over time and what additional diagnostic studies might be helpful to order, to determine whether or not she has additional injuries that we typically see with that specific type of mechanism.

Importantly, Dr. Jaeger testified that it was very common to have trauma from both shaking and blunt force.

¶35 Scott confirmed that one of his tasks when investigating a critical injury to a child is to stay in constant communication with medical personnel who are providing the child treatment. Indeed, Scott explained that "part of my plan was to let them know the mechanism of injury; when the injury occurred and what led up to the injury, what happened after the injury." Scott testified that when he was telling Eskew it was necessary to be honest about what happened, he was "not lying to her," because it was part of the overall investigation to provide information to medical providers to assist with Brooklynn's treatment.

¶36 At the beginning of the interview, Scott advised Eskew of her *Miranda* rights. He handed Eskew the form with the rights and advised her to read it over before signing. She took time to review it, and then signed the form indicating she had read her rights.

At the risk of being redundant, a *Miranda* advisement informs a person that anything they might say could be used as incriminating evidence against them in a court of law; that they have the right to court-appointed counsel to assist in their defense and with their decision of whether to speak with law enforcement; and that they have the right to remain silent and to refuse to answer any questions propounded by law enforcement. Thus, following a *Miranda* advisement, it is illogical to suggest that the person so advised, in the absence of evidence to the contrary, does not know that the purpose of the interview is to gather evidence which potentially could be used against them in a possible criminal investigation or prosecution. Indeed, this Court has not suggested that there was any inadequacy in the *Miranda* warnings. Neither has the Court suggested that law enforcement indicated Eskew would not face criminal liability, that the information would not be used against her, or that law enforcement in any way made a representation which would contradict the clear warnings provided by an adequate *Miranda* advisement. That law enforcement also wanted to learn the mechanism of Brooklynn's injury and represented this as their purpose does not make the representation a misstatement, lie, or untruth—particularly given the responsibility of law enforcement for obtaining a history when a nonverbal infant has been critically injured.

¶37 The District Court appreciated that the medical evidence established the mechanism of Brooklynn's death was a blunt force impact to the front of the skull and that the skull fracture could not have been caused by shaking alone. However, medical experts could not rule out the possibility that Brooklyn had also been shaken. The District Court explained, "this isn't about the actual accuracy of her confession; it's about

18

whether it was voluntary, knowing and intelligent." Further, the District Court appreciated the fact that law enforcement did not believe they were getting a truthful statement and persisted in representing they needed accurate information for treatment of Brooklynn's injuries, concluding that such representations did not render Eskew's statements involuntary. The District Court held:

> Well, they said that up-front and I – when I read the transcript, I was initially really concerned about that, frankly. But as I got down through the course of the thing, that kind of fell away. And what it came down to, it seemed to me, at the end of the day was, is that just were – they were persistent, doggedly persistent, in saying, we basically – we don't believe you, you're lying. The facts that we know don't support that. . . . They didn't misrepresent the medical evidence as we know it or as it existed at the time. And I don't think that the constitutional law in this State or this country has advanced so far that police can't say we don't believe you; we think you're lying.

¶38 We review a district court's findings of fact on a motion to suppress an admission or a confession to determine whether the findings are clearly erroneous. *Old-Horn,* ¶ 13. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if this Court has a definite or firm conviction that the district court committed a mistake. *State v. Loh*, 275 Mont. 460, 475, 914 P.2d 592, 601 (1995). Significantly, a motion to suppress based upon the voluntariness of a confession or admission is "largely a factual determination that is *within the discretion of the district court*." *Grey*, 274 Mont. at 209, 907 P.2d at 953 (citing *State v. Lenon*, 174 Mont. 264, 271, 570 P.2d 901, 906 (1977) (emphasis added)); *see also Old-Horn*, ¶ 14 ("The question of whether a defendant has given a confession

voluntarily is a factual determination within the province of the district court."); *State v. Hayworth*, 1998 MT 158, ¶ 20, 289 Mont. 433, 964 P.2d 1.

¶39    In my opinion, the Court conveniently omits from its standard of review that portion which recognizes the matter is "largely a factual determination that is within the discretion of the district court." *Grey*, 274 Mont. at 209, 907 P.2d at 953; *Old-Horn*, ¶ 14.  In doing so, the Court ultimately substitutes its evaluation of the evidence for that of the trial court.   A trial court is in the best position to observe the demeanor of the witnesses and assess their credibility.  A trial court's factual findings may not be reversed unless clearly erroneous and not supported by substantial evidence.  As I find the court's factual findings to be supported by substantial evidence and, further, that the court correctly applied the law by considering the totality of circumstances, I would not substitute my evaluation of the evidence simply because I would have concluded differently had I been sitting as a trial judge.

¶40    In evaluating the voluntariness of a confession, the court was required to make particular findings of facts based on the law.  In determining the voluntariness of a defendant's confession, the United States Supreme Court has directed that the assessment consider the "totality of all the surrounding circumstances," including the interrogation techniques used by the police; the defendant's age and level of education; the defendant's prior experience with the criminal justice system; the defendant's demeanor, coherence, articulation, and capacity to make use of his or her faculties; and whether the defendant was advised of his or her *Miranda* rights.  *Schneckloth v. Bustamonte*, 412 U.S. 218,

225-26, 93 S. Ct. 2041, 2046 (1973); *Old-Horn*, ¶ 17. This Court has explained the factors relevant to the inquiry include:

> [T]he defendant's age, maturity, education, physical condition, and mental health; the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties; the defendant's background and experience, including any prior experience with the criminal justice system and police interrogation; the length, mood, location, and continuity of the questioning; the use of threats, violence, or physical punishment (such as deprivation of food or sleep); the exertion of improper influence, psychological coercion, deception, or implied or express promises; and whether the police advised the defendant of his or her rights to remain silent and to have counsel present during custodial interrogation.

*Morissey*, ¶ 47. Voluntariness is supported by the presence of timely and complete *Miranda* warnings. *State v. Reavley*, 2003 MT 298, ¶ 15, 318 Mont. 150, 79 P.3d 270. As it pertains to voluntariness of confessions, the burden lies with the prosecution to prove by a preponderance of the evidence that the confession was voluntary. Section 46-13-301, MCA. Thus, the District Court was required to make factual findings under the totality of circumstances by considering the particular aforementioned factors to determine whether the State established by a preponderance of the evidence that Eskew's admissions were voluntary.

¶41 And the District Court did. The District Court, which was familiar with the nature of the entire proceeding, heard testimony from witnesses, reviewed the videotape interview, and issued comprehensive and detailed findings of facts and conclusions of law. The District Court found the *Miranda* warnings were adequate and complete. It found that although Eskew sobbed throughout the first half of the interview, she progressively became more composed. Indeed, she was "quite composed, articulate and

21

affirmatively explanatory when answering" as the interview progressed, and the District Court noted that "when answering, for the most part, she was not sobbing or crying [.]" The District Court's findings were supported by the fact that during the entire time of the interview, Eskew did not once ask about the welfare of her child and although she appeared to be sobbing, Scott testified she was not tearful. The District Court observed that while Eskew became more composed as the interview progressed, the detectives, conversely, became more frustrated, confrontational "and emphatic in challenging her veracity and in challenging the consistency of her statements during the course of the interview." The District Court specifically found that both detectives "at all times, remained civil, respectful and generally polite in their confrontation and interrogation regarding this very serious matter to all parties involved." Observing that the detectives were not physically threatening in any manner and did not conduct or impose themselves in a physical or menacing manner, the District Court nonetheless found that there were times when the detectives raised their voices, but never yelled. The District Court placed this in context, however, finding this was only noteworthy because of their general soft-spoken approach otherwise used throughout the interview. The District Court determined that the detectives used a mixture of leading questions and open-ended questions and "employed a personal variation of . . . the Reid Technique" that, with the exception of the representation that the focus of the interview was to facilitate medical care for the child, was not "unduly or unfairly coercive, deceptive or manipulative under the totality of circumstances."

22

¶42 The District Court observed that at the time of the interview Eskew was twenty-one years old; the mother of a six-month-old child; single and living in the home of her parents with the child. Further, the court observed that by "all credible indications in this case, [Eskew appeared] to be a highly intelligent and articulate young woman, of average or above-average maturity for a 21-year-old in her circumstance." The District Court noted that she was employed at JCPenney, was a high school graduate, and had obtained a two year Associate of Arts Degree with a major in Education from the Montana State University, College of Technology. The District Court observed that Eskew had no prior history or reports of mental health problems and that the interview was neither "physically or psychologically overwhelming." The District Court stated:

> [D]espite the inherently traumatic nature of her situation and circumstance, whether she be guilty or be innocent, Ms. Eskew manifestly appeared to be fully cognizant of her situation, circumstance, and most importantly, the substance of the interview questions being posed to her. There was no indication, whatsoever, that she wasn't tracking, that she was being overwhelmed or that she was being coerced or manipulated, in any regard.

The District Court concluded by explaining

> At [the] end of the day, the detailed incriminating statements and demonstrations made by Ms. Eskew came from her. She did not simply acquiesce with a yes or a nod to detailed police suggestions about what happened, [but] articulated the specifically incriminating details and made the specifically incriminating demonstration to police.

¶43 Importantly, the District Court addressed the issue surrounding the detectives' alleged misrepresentation that their only purpose in interviewing Eskew was to obtain medical information for the care of her child. As the District Court observed, even if the purpose of the interview was to facilitate a criminal investigation, this did not make the

23

interview coercive, deceptive, or otherwise manipulative. At the time of the interview, detectives believed Brooklyn had suffered shaking injuries and only later learned that the child's trauma was related to blunt force. The District Court found that they did not "trick or manipulate or deceive Ms. Eskew to make the incriminating statements and demonstrations that she ultimately made." The District Court specifically found that the incriminating statements were the result of Eskew being challenged "about her veracity and the consistency of her accounts during the interview, in relation to the apparent or preliminary nature of the child's injuries as then known to the police . . .," and not as a result of any misrepresentation.

¶44 It bears mentioning that the suspicions of Scott and Slaughter that Eskew was not being truthful during the interview ultimately proved to be well-founded. Shortly after their interview, detectives learned that Eskew had lied about being alone with Brooklynn at the time of the incident. Rather, Eskew's boyfriend, Greg Robey, was at Eskew's home with Eskew and Brooklynn and ran when he heard the ambulance sirens. Law enforcement also learned that Eskew had lied to them at the hospital when she said a male who had approached her was her brother when, in fact, it was Robey. Further, law enforcement subsequently learned that Robey and Eskew had sexual intercourse on the day of the incident, and provided different accounts of the encounter. Eskew subsequently gave birth to Robey's twins and claimed that he had raped her on September 18, 2012. Conversely, Robey testified that he did not want to have sex, but that Eskew did. In light of these subsequent discoveries by law enforcement, it is clear Scott and Slaughter were justified in their suspicions regarding Eskew's veracity and

24

their challenges to the truthfulness of her statements were entirely reasonable and well-founded. As the District Court observed, there is nothing that prevents the police from saying "we don't believe you."

¶45    The Court is incorrect in its assessment of the District Court's findings of fact. The Court asserts multiple "misrepresentations" were made by police which the District Court, in fact, found were true. This is particularly the case when the Court states the District Court found the detectives "purposely lied" in order to manipulate and misrepresent the situation to Eskew. The District Court found that if there was any misrepresentation by detectives it concerned the detectives' representation that their only purpose was to obtain information for medical care, rather than to facilitate a criminal investigation. The representation, however, was singular in its content, although perhaps made on several occasions. Nonetheless, it is clear the District Court and the parties understood the detectives believed the child suffered from shaking injuries at the time of the interview. It is also equally clear that one of the purposes of the interview was to obtain a history of the mechanism of injury to a nonverbal infant from the only person who could speak for the child—the child's mother, Eskew. The Court fails to grasp the significance of this difference, which the District Court was able to understand and thereby place the representation within context of the overall interview. This is a poignant example of why the standard of review is so significant. The Court finds no error in the District Court's factual findings and, indeed, accepts them in total, but nonetheless substitutes its evaluation of the evidence for that of the District Court.

¶46    A confession that is extracted by a threat of violence, the exertion of any improper influence, or direct or implied promises has the potential to be involuntary. *Reavley*, ¶ 16. There were no threats of violence or direct or implied promises. Assuming for the sake of argument a misrepresentation as to the *purpose* of the interview was made, such does not establish an improper influence when *Miranda* warnings are adequate, understood, and acknowledged. This is particularly so when nothing with respect to the misrepresentation undermines or contradicts the *Miranda* warnings and when law enforcement are required to assist in obtaining medical information for health care providers. Here, the victim was a non-verbal infant whose mother indicated no one else but herself was with the infant at the time of the incident. The child's life lay in balance as medical providers attempted to assess the mechanism of her injuries and to provide appropriate medical treatment to save Brooklynn's life. Although the purpose of the interview may have been, in part, to conduct a criminal investigation, *Miranda* warnings covered this purpose and nothing in the record establishes any representation contradicted these warnings. That there may have also been a purpose of law enforcement to save Brooklynn's life by learning the mechanism of the injury does not render Eskew's confession involuntary. While we cannot change the tragic circumstances of this case, we can appreciate and recognize the legitimate purpose of law enforcement conducting an interview to gain a history and learn the mechanism of injury in order to facilitate Brooklynn's treatment.

¶47    In my opinion, given that the voluntariness of a confession is ultimately a factual determination to be made by the District Court, we have distorted the standard of review

26

in order to substitute our evaluation of the evidence for that of the trial court. In doing so, I am sure we fail to appreciate many of the nuances, circumstances, and subtleties that the trial judge observed first-hand by presiding over these proceedings. If we correctly applied the standard of review, we would find that the District Court's findings were supported by substantial evidence, the District Court clearly did not misapprehend the effect of the evidence, and there was no mistake in determining that Eskew's admissions were voluntary based upon a preponderance of the evidence. The District Court only had to find that a preponderance of the evidence supported voluntariness. It was for the jury, and not this Court, to decide the ultimate question of voluntariness and the weight to be attributed to Eskew's statements.

¶48 Accordingly, I would find that the confession was voluntary and reach the more difficult issue of whether the District Court abused its discretion in excluding expert testimony on false confessions. To the extent we hold otherwise, I dissent.


/S/ LAURIE McKINNON


Judge Heidi Ulbricht, District Court Judge sitting for Justice Patricia Cotter, joins in the Dissenting Opinion of Justice McKinnon.


/S/ HEIDI ULBRICHT